UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

S.C. and J.C., *individually, and on behalf of T.C., a minor*,

                              Plaintiffs,

                    v.

THE KATONAH-LEWISBORO CENTRAL
SCHOOL DISTRICT,

                              Defendant.

Case No. 15-CV-703 (KMK)

OPINION & ORDER

Appearances

Lawrence D. Weinberg, Esq.
Bloomfield, NJ
*Counsel for Plaintiffs*

James P. Drohan, Esq.
Thomas, Drohan, Waxman, Petigrow & Mayle, LLP
Hopewell Junction, NY
*Counsel for Defendant*

KENNETH M. KARAS, United States District Judge:

        Plaintiffs S.C. and J.C. (collectively, "Plaintiffs"), bring this Action individually, and on

behalf of their child T.C., pursuant to the Individuals with Disabilities Education Act ("IDEA"),

20 U.S.C. § 1400 *et seq.*, seeking to overturn the determination of the State Review Officer

which found that the Katonah-Lewisboro Central School District ("Defendant" or "District"), is

not required to reimburse Plaintiffs for their unilateral placement of T.C. at the Prospect School

("Prospect"), for the 2012-2013 and 2013-2014 school years.[1]  The Parties cross-move for

summary judgment.  (*See* Dkt. Nos. 10, 15.)  For the reasons given, Plaintiffs' Motion for

Summary Judgment is granted, and Defendant's Motion for Summary Judgment is denied.

## I.  Background

### A.  Factual Background

T.C. is a 13-year-old child classified as "multiply disabled," who resides with his father

S.C. and his mother J.C. within the District.  The Parties do not dispute that T.C. is a student with

significant cognitive impairment.  (*See* Resp. to Pls.' Local Civil Rule 56.1 Statement of Material

Facts ("Def.'s 56.1") ¶ 11 (Dkt. No. 14); *see also* Mem. of Law in Supp. of Def.'s Cross-Mot.

for Summ. J. & in Opp'n to Pls.' Mot. for Summ. J. ("Def.'s Mem.") 2 (Dkt. No. 16).)  Various

evaluations have found T.C. to present with a number of disorders or conditions, including:

Attention Deficit/Hyperactivity Disorder–Combined Type, Mixed Receptive-Expressive

Language Disorder, Speech Motor Disorder, Motor Based Coordination Disorder, Language

Based Learning Disorder, Hypotonia, and Oral-Motor and Global Motor Apraxia.  (*See* Ex. F

("Stern 2010 Report") at 2, 12; Ex. AA ("Dorta Report") at 7.)[2]  T.C. has "wide ranging

neurocognitive deficits with the most severe aspect being his very poor spatial-nonverbal skills,

---

[1] The Court notes that the caption of this case, and Plaintiff's Complaint, refers to
Defendant as the "Katonah-Lewisboro Central School District," while Defendant refers to itself
in its papers as the "Katonah-Lewisboro School District."

[2] The exhibits cited are from the administrative record before the State Review Officer,
which was filed with the Court under seal.  (*See* Dkt. No. 8.)  Lettered exhibits were originally
introduced by Plaintiffs and numbered exhibits were originally introduced by the District.  The
Impartial Hearing Officer and State Review Officer opinions, cited to throughout this Opinion &
Order, were also included in the filing made under seal.

limited language processing ability, and very vulnerable 'executive functions.'"  (Dorta Report 7.)

### 1.  T.C.'s Educational History

#### a.  Kindergarten Through Third Grade

T.C. attended school in the District for kindergarten through third grade.  (*See* Def.'s 56.1 ¶¶ 4–6, 8, 21–22; *see also* Stern 2010 Report 4; Impartial Hearing Officer Findings of Fact and Decision ("IHO Op.") 6–7, 8.)

In kindergarten, the 2007-2008 school year, T.C.'s Individualized Education Program ("IEP") provided for a 12:1:1 (12 students, one teacher, one paraprofessional) special class in the District, with related services of speech and language therapy ("SLT"), physical therapy ("PT"), and occupational therapy ("OT").[3]  The IEP also provided for a 2:1 aide (two students to one

---

[3] The IDEA's primary mechanism for guaranteeing students with disabilities access to a "free appropriate public education" is the IEP.  *See* 20 U.S.C. § 1414(d).  An IEP is a "written statement" setting forth (1) "the child's present levels of academic achievement and functional performance"; (2) "measurable annual goals," both "academic and functional"; (3) "how the child's progress . . . will be measured"; (4) "the special education and related services and supplementary aids and services" to be provided to the child; (5) "an explanation of the extent, if any, to which the child will not participate" in regular school classes and activities; (6) how the child will participate in regular testing; (7) a "projected date for the beginning of" the child's support services and details about their "frequency, location, and duration"; and (8) a statement regarding the child's goals for and transition to life post-secondary education.  *Id.* § 1414(d)(1)(A)(i)(I)–(VIII).  The IEP is created and periodically reviewed and revised by a "team consisting of the child's parents, the child's regular classroom teacher, a special-education teacher, a representative of the local educational agency, and other individuals with knowledge of the child."  *G.B. ex rel. N.B. v. Tuxedo Union Free Sch. Dist.*, 751 F. Supp. 2d 552, 572 (S.D.N.Y. 2010), *aff'd*, 486 F. App'x 954 (2d. Cir. 2012).

aide), because of T.C.'s weak motor skills and for his safety. (*See* Def.'s 56.1 ¶ 5; *see also* Ex. S at 1–2; Tr. 780–85.)[4]

In first grade, the 2008-2009 school year, T.C.'s IEP provided for a 12:1:1 special class with related services of SLT, PT, OT, adapted physical education, and a weekly small group counseling session. (*See* Def.'s 56.1 ¶ 6; Ex. U at 1–2.)[5]  Additionally, the aide provided by the District was changed from a 2:1 student to aide ratio to a 1:1 student to aide ratio. (Ex. U at 2.)

In second grade, the 2009-2010 school year, T.C.'s IEP once again provided for a 12:1:1 special class with similar related services of SLT, PT, OT, adapted physical education, and a weekly small group counseling session. (Ex. BBB at 1–2.)  T.C. did not have a teacher aide for the 2009-2010 school year. (*Id.*; *see also* Def.'s 56.1 ¶ 8.)  The IEP also provided for a consultant teacher in a 12:1 ratio in an integrated classroom once a week for three hours. (Ex. BBB at 1.)

In November and December 2009, when T.C. was seven years old and in second grade, he was examined by Dr. Nelson Dorta ("Dr. Dorta"), a pediatric neuropsychologist. (*See generally* Dorta Report.)  T.C. was administered a variety of neuropsychological exams. (*Id.* at

---

[4] Transcript citations correspond to the transcript of the impartial hearing, which is a component of the administrative record before the State Review Officer, filed with this Court under seal.

[5] The Parties quibble over the extent to which the IEPs offered each year differed from previous years. (*See, e.g.*, Def.'s 56.1 ¶ 4.)  Plaintiffs contend that T.C. "attended the same or similar District 12 students to one teacher program for kindergarten, first grade, second grade, and third grade." (*Id.*)  The District insists that the programs recommended for each school year were "materially different," pointing to changes in annual goals as well as program modifications, and changes to the number of teaching professionals in the class room (a teaching consultant was removed after the 2009-2010 school year and a paraprofessional was added after

2.)  Based on the testing, Dr. Dorta concluded that T.C.'s "overall cognitive abilities [were] in the deficient range with below average verbal and further below average nonverbal ability."  (*Id.* at 7.)  Further, the data showed that T.C. "ha[d] wide ranging neurocognitive deficits with the most severe aspect being his very poor spatial-nonverbal skills, limited language processing ability, and very vulnerable 'executive functions.'"  (*Id.*)  T.C. "struggle[d] with decoding and basic reading comprehension as well as having very limited quantitative and arithmetic competency."  (*Id.*)  Dr. Dorta also noted that T.C's "attention was found to be quite poor," (*id.* at 6), that "[v]aried measures tapping skills dependent on steady attention were also poor," (*id.*), and that T.C.'s "high levels of inattention, distractibility, and hyperactivity [did] rise beyond the level typically seen in this form of cognitive deficit," (*id.* at 7).  T.C.'s strengths, according to the report, lay "in his warm and friendly demeanor as well as his good engagement and basic social skills," and T.C. presented as a "nicely related, compliant, and friendly youngster."  (*Id.*)

Dr. Dorta also made a number of recommendations for T.C.'s upcoming third grade school year.  He stated at the outset that "[T.C.'s] current educational setting that addresses his significant cognitive and language needs as well as providing behavioral support is fully supported by th[e] data."  (*Id.* at 8.)  For third grade, Dr. Dorta recommended an "8:1:1 prototype classroom for all core academic instruction," complimented "by 4 times weekly speech and language therapy and twice weekly each PT and OT."  (*Id.*)  Dr. Dorta also recommended that T.C.'s "academic intervention should *intensively* focus on helping him acquire the mechanics of reading decoding and fluency to an automatic level," and that "[s]mall group work, ideally with

the 2010-2011 school year).  (*Id.*)

no more than 3 children in a group, should be accompanied by *one-on-one tutorials*." (*Id.*) To address T.C.'s "attentional difficulties," Dr. Dorta recommended a number of things, including careful monitoring of T.C. for signs of fading attention, careful monitoring of the amount of material presented to T.C., and repetition of verbal directions if there are competing background classroom noises. (*Id.*)

On January 26, 2010, the Committee on Special Education ("CSE") met and reviewed Dr. Dorta's report. (Def.'s 56.1 ¶ 16; *see also* Ex. CCC at 5.) The CSE indicated that the results of Dr. Dorta's evaluation of T.C. revealed significant cognitive, motor, and language needs. (Ex. CCC at 5.) However, no changes were made to the 2009-2010 IEP in place at that time. (Def.'s 56.1 ¶ 16–17.)

On March 4, 2010, the CSE developed T.C.'s IEP for third grade, the 2010-2011 school year. (Def.'s 56.1 ¶ 21; *see* Ex. X.) The program developed for T.C. included a 12:1:1 special class and substantially the same related services as the previous year. (*See* Ex. X at 1–2.) There was no weekly consultant teacher as in the previous IEP. (*Id.*) The frequency of T.C.'s special class was changed from one time daily for three hours, to five times daily for 45 minutes each. (*Id.* at 1.)

In November and December 2010, when T.C. was eight years old and in the third grade, Dr. Catherine Stern ("Dr. Stern"), a clinical neuropsychologist, evaluated T.C. (Def.'s 56.1 ¶ 23; *see* Stern 2010 Report.) The report was reviewed at a CSE meeting on February 28, 2011. (Def.'s 56.1 ¶ 27.) Dr. Stern's report concluded that T.C. is "a happy and exuberant young boy" who put forth "good effort" and "with consistent encouragement and structuring from the

examiner, was able to complete all tasks presented to him," (Stern 2010 Report 12), and that, "[o]verall, [T.C.] did seem motivated to do his best . . . [but] [h]e did . . . present with fluctuating attention, significantly slow processing, and a tendency to fatigue which resulted in him requiring a high degree of structure, redirection to the task at hand, and frequent breaks to assure his meaningful task involvement," (*id.* at 6).  Dr. Stern further found that T.C. demonstrated "extremely poor skills in the domain of reading," performed "significantly below age expectations on tests of arithmetic," suffered from "profoundly poor" spelling, and was "unable to express himself in writing."  (*Id.* at 12.)  Dr. Stern concluded that T.C. made "limited academic progress" since his 2009 evaluation with Dr. Dorta, and he "currently possesses academic capabilities . . . at a kindergarten to early 1st grade level."  (*Id.*)  Dr. Stern's report did note, however, that T.C.'s profile suggested "age-appropriate verbal memory skills," which indicated that "when information is *truly learned and encoded*," T.C. is able to retain it in memory.  (*Id.* at 13.)

Dr. Stern's report emphasized the "unique pattern" of T.C's disabilities, and the fact that "[m]oving forward[,] academic placement and specific curriculum decisions will need to address [T.C.'s] unique profile and multiple areas of need."  (*Id.* at 14.)  Dr. Stern further noted that "[i]t will be critical to focus on [T.C.'s] *availability for learning*, which will involve a careful accommodation of his slow processing, attention issues, and tendency to fatigue."  (*Id.*)  As such, she explained that the teaching of T.C. must be targeted to when he "is *able to take in information*" and "will most certainly involve significant review and repetition of information to assure that he establishes a solid foundation that can be built upon."  (*Id.*)  Based on her testing,

Dr. Stern made numerous educational recommendations, some of which included:  intensive special education services, modified curriculum with a multi-sensory, sequential approach to reading, assistive technology, frequent breaks to address T.C.'s tendency to fatigue, typing instruction, and social skills training, among others.  (*Id.* at 15–17.)  Dr. Stern also noted that it would be "very important that [T.C.'s] classroom be structured in a way to help hi[m] maintain his attention."  (*Id.* at 17.)

### b.  T.C.'s 2011-2012 School Year (Fourth Grade)

On June 9, 2011, the CSE reconvened and developed an IEP for the 2011-2012 school year (the "June 2011 IEP").  (Def.'s 56.1 ¶ 31.)  The June 2011 IEP recommended a class size of 12:1:2 (12 students, one teacher, and two paraprofessionals).  (Def.'s 56.1 ¶ 32; *see also* Ex. 19.)  The June 2011 IEP changed T.C.'s classification from speech and language impaired to intellectual disability.  (Def.'s 56.1 ¶ 34.)  After Plaintiffs objected to the change in classification, the CSE agreed to reclassify T.C. as "multiply disabled," with Plaintiffs' consent.  (Def.'s 56.1 ¶ 35.)  Plaintiffs objected to the District's recommendation in the June 2011 IEP and instead enrolled T.C. at Prospect.  (Def.'s 56.1 ¶¶ 36–37.)

For the 2011-2012 school year, T.C. received one-on-one instruction for his "core academics," at Prospect.  (Tr. 1066.)[6]  T.C. was integrated with third grade general education students at Wooster School (which was affiliated with Prospect) for social studies, art, gym,

---

[6] T.C., in fact, was one of only two students in all of Prospect for the 2011-2012 school year.  (Tr. 1057–58.)

music, recess, and lunch.  (*Id.* at 1067–69.)[7]  Dr. Kelly Raymond ("Dr. Raymond"), the Director of Curriculum and Assessment at Prospect, testified that T.C. arrived at Prospect with "minimal" decoding skills; however, by the end of the 2011-2012 school year, he was using decoding skills for one-syllable words and reading text in "his environment."  (*Id.* at 1071.)  With respect to math, Dr. Raymond reported that T.C. was able to do some simple addition and subtraction, and he was beginning to learn two-digit addition.  (*Id.*)  According to progress reports from Prospect, T.C. was either meeting, or ahead of, target expectations in reading, and was meeting expectations in a number of his math goals.  (Ex. H at 1–2.)  However, a number of T.C.'s writing and math skills were still developing, and some proposed skills were listed as "not applicable" or "not introduced yet."  (*Id.*)  According to the report, T.C. was meeting target expectations in science and social studies and was ahead of target expectations in community/social skills, which remained a relative strength for T.C.  (*Id.* at 2–3, 7.)

In advance of the CSE meeting to determine T.C.'s IEP for the 2012-2013 school year, the District administered an educational evaluation and psychological evaluation of T.C.  (*See* Exs. 8, 10.)  The educational evaluation concluded that T.C.'s standard scores were "low average in writing samples and very low in letter-word identification, passage comprehension, reading fluency, writing fluency, spelling, calculations, math fluency[,] and applied problems."  (Ex. 8 at 5.)  The psychological evaluation concluded that T.C.'s "overall cognitive functioning . . . was found to be within the Extremely Low Range" (in the 0.2 percentile).  (Ex. 10 at 6.)  The

---

[7] For the social studies class, T.C. was accompanied by his special education teacher, Howard Gorman ("Mr. Gorman").  (Tr. 1067, 1070.)

evaluation indicates that T.C.'s full scale IQ of 56 should be "deemphasized" due to "differences between the composites" of the score.  (*Id.*)[8]

### c.  T.C.'s 2012-2013 School Year (Fifth Grade)

On June 14, 2012, the CSE held a meeting to develop T.C.'s IEP for the 2012-2013 school year (the "June 2012 IEP").  (Def.'s 56.1 ¶ 43; *see* Ex. 2 ("June 2012 IEP").)  The meeting was attended by District representatives, including, among others, the psychologist and special education teacher whom had evaluated T.C. in advance of the meeting, Maria Mellon ("Ms. Mellon") (a District special education teacher who was to teach the special education class that was recommended for T.C.), a speech and language therapist, a physical therapist, and an occupational therapist.  (June 2012 IEP 1; *see also* Ex. 3 at 1.)  Also in attendance were Plaintiffs and, at Plaintiffs' invitation, Dr. Raymond and Mr. Gorman from Prospect.  (June 2012 IEP 1; *see also* Tr. 46–47.)

The CSE discussed the recent educational and psychological evaluations of T.C. completed by the District.  (June 2012 IEP 2; *see also* Tr. 47–48, 53.)  The June 2012 IEP reflects that the results of the educational evaluation demonstrated significant weaknesses in math, reading, and writing.  (June 2012 IEP 7–8.)  The June 2012 IEP also notes that the educational evaluation revealed that T.C. "requires extensive prompting in order to demonstrate basic skills across all academic areas," that he "evidences an impulsive work style, and weak overall stamina," and, therefore, "[s]ignificant refocusing is required to help him maintain

---

[8] The IQ score of 56 represented a 15-point drop compared to the IQ score of 71 that T.C. received when examined by Dr. Stern in late 2010.  (*See* Stern 2010 Report 18.)

attention, to re-engage him when he becomes tangential, and to put forth necessary effort to achieve greater accuracy with basic tasks." (*Id.* at 8.)

The CSE also listened to Mr. Gorman describe T.C.'s experience and progress at Prospect over the 2011-2012 school year. (*Id.* at 2; *see also* Tr. 56–57, 900–01.) Among other things, Mr. Gorman told the group that T.C.'s writing skills had improved with regard to letter formation, proper size, and spacing, and that T.C. had a solid base of 50 high frequency words that he could spell. (June 2012 IEP 2.) According to Mr. Gorman, T.C. was reading at a first grade or early second grade reading level. (*Id.* at 8.) With regard to math, Mr. Gorman stated, in part, that T.C. had "demonstrated the ability to add numbers greater than two digits while [needing] to regroup," and that in a classroom grocery store, T.C. could "pick out a few items, determine their total cost, determine if the money he has to purchase them is adequate, and then determine the change if applicable." (*Id.* at 7.) Mr. Gorman also informed those present of some of the assistive technologies that Prospect used and noted that "[f]requent progress probes as well as prompts and cues from the teacher have helped [T.C.] to progress and feel successful." (*Id.*)

The June 2012 IEP recommended a 12:1:2 special class for core subjects with related services of SLT, OT, counseling, and parent counseling/training. (Def.'s 56.1 ¶ 44; June 2012 IEP 17.) The related services were to occur in small groups ranging from individual therapy sessions to sessions in a 5:1 setting. (June 2012 IEP 17.) Ms. Mellon, who would be T.C.'s teacher if he returned to the District for the 2012-2013 school year, told those at the meeting that her program "replicates many of the instructional strategies and activities that have contributed to [T.C.'s success during the 2011-2012] school year, such as authentic activities (cooking every

11

Friday), weekly community based activities, academics that are reinforced by hands-on activities and opportunities for mainstreaming." (*Id.* at 2–3.)  She further noted that "[r]ead aloud is incorporated, accompanied by questions to support comprehension[;] [that] project based learning [and] authentic activities that support a connection between the abstract [] nature of words on a page and real life experiences," are used; and that "[m]athematics is also supported by real life applied experiences." (*Id.* at 3; *see also* Tr. 914–15.)

The June 2012 IEP also included a number of supplementary aids and services, program modifications, and accommodations, including modified classroom work and homework (such as alternative worksheet formats) and access to assistive technologies. (June 2012 IEP 17–18.)  The June 2012 IEP also provided for "[r]efocusing and [r]edirection," noting that "[d]ue to [T.C.'s] attentional issues, [he] must be prompted to stay on task in all subject areas." (*Id.*)

Towards the end of the meeting, Plaintiffs noted that they disagreed with the recommendation and asked the District to consider either an out-of-district or BOCES placement for T.C. (*See* Def.'s 56.1 ¶ 45; Tr. 71–72, 916.)  District representatives told Plaintiffs that they would be sent packets from BOCES and other out-of-district placements after the meeting. (Tr. 917.)  However, the District never conducted an out-of-district program search for T.C. and never provided Plaintiffs with the promised packets, but instead informed Plaintiffs that because the District determined that its recommended program would be T.C.'s least restrictive environment, it would not consider an out-of-district placement. (*Id.* at 72, 917, 920; *see also* Ex. TTT.)

Having rejected the June 2012 IEP's recommendation, Plaintiffs chose to have T.C. remain at Prospect for the 2012-2013 school year. (Def.'s 56.1 ¶ 47; Tr. 1082.)[9] According to Dr. Raymond, T.C. spent this school year in a class ranging from two to four students. (Tr. 1082.)[10] T.C. continued to spend gym, lunch, recess, art, and library with general education students. (*Id.* at 1083.) Dr. Raymond further testified that T.C. showed "steady progress in reading," throughout the 2012-2013 school year, and that he was "able to decode a variety of unfamiliar words and self-correct." (*Id.*) Dr. Raymond did note that T.C.'s progress that year was "inconsistent" and that his progress tends to be "kind of slow and steady, a step back, two steps forward." (*Id.* at 1084.) T.C.'s Prospect progress report for the 2012-2013 school year indicates that he was meeting expectations for a number of his objectives. (Ex. I at 3–8.) However, a number of T.C.'s objectives remained "developing" by the end of his school year. (*Id.*)

---

[9] Connie Hayes ("Ms. Hayes"), Director of Special Services at the District, testified that J.C. told her in March of 2012, before the June 2012 IEP was determined, that she "would not consider placement in the district." (Tr. 55–56.) S.C. testified that J.C. told Ms. Hayes that "we would not place [T.C.] back in that specific special education program" and that she "was talking about the program, not the district." (*Id.* at 1010–11.)

[10] According to S.C., T.C.'s 2012-2013 school year consisted of instruction in math and literacy in small groups that could be one-to-one, groups of two, or groups of four. (Tr. 930–31.) However, when asked "how many other students" T.C. was "grouped with for the Common Core subjects" during that school year, Dr. Raymond replied only that "[t]here were four students in his grade or class," (*id.* at 1121), and so it is unclear to what extent T.C. actually received one-on-one instruction in the 2012-2013 school year, (*see* Def.'s 56.1 ¶ 51). Dr. Raymond did testify, however, that for math and reading the ratio was no larger than two-to-one during the 2012-2013 school year. (*See* Tr. 1087–88.)

On April 15, 2013, Dr. Stern conducted a classroom observation of T.C. at Prospect. (*See generally* Ex. J ("Stern 2013 Observation").)  Dr. Stern observed T.C. receiving instruction in both reading and math, both in a one-on-one setting and later in a two-student session for another reading lesson.  (*Id.* at 1–2.)  In her report describing the observation, Dr. Stern noted that T.C.'s teachers all explained that T.C. had been "making steady, although slow and measured[,] progress in reading, math, and speech/language skills."  (*Id.* at 3.)  Dr. Stern concluded that T.C.'s "current educational setting is one that provides significant opportunity for one-to-one instruction and is viewed as an appropriate setting to support his unique constellation of learning needs."  (*Id.*)  She noted that T.C.'s attention greatly impacted his "availability for learning," and that his current educational setting, "which provides highly individualized instruction, allows for flexibility in lessons, as well as the opportunity to shift from one activity to another in accordance with [T.C.'s] focus and receptivity."  (*Id.*)[11]

### d.  T.C.'s 2013-2014 School Year (Sixth Grade)

On May 31, 2013, the CSE held a meeting to develop T.C.'s IEP for sixth grade, the 2013-2014 school year (the "May 2013 IEP").  (Def.'s 56.1 ¶ 48; *see also* Ex. 1 ("May 2013 IEP").)  Ms. Mellon, who again would have been T.C.'s teacher if he returned to the District for sixth grade, once again described her expected classroom, which would place "emphasis on comprehension, decoding, [and] writing portfolios."  (May 2013 IEP 2.)  She noted that "all students maintain a writing journal and writing portfolio," and that "technology is incorporated,

---

[11] A month later, T.C. was observed by Ms. Hayes.  She observed T.C. receiving individual instruction in Math.  (*See* Ex. 13 at 1.)

math is differentiated (as are all subjects), [and that there is] an emphasis on functional life skills [and] counting money." (*Id.*)

The May 2013 IEP ultimately recommended a 12:1:2 class with related services that were the same as the June 2012 IEP. (*Compare* May 2013 IEP 15–16, *with* June 2012 IEP 17; *see also* Def.'s 56.1 ¶ 48; Tr. 92.) The May 2013 IEP also noted that the offered class would be moving to the District's middle school, from the elementary school. (May 2013 IEP 2.) Ms. Hayes testified that T.C. would have been integrated with his typically developing peers for lunch, recess, and specials. (Tr. 89; *see also* Def.'s 56.1 ¶ 48.) As Ms. Hayes testified, the May 2013 IEP is in large part identical to the June 2012 IEP—with the same program recommendation, goals, and methods—with the only changes being the addition of new math and reading test results and related alterations of the descriptions of T.C.'s math and reading abilities. (Tr. 92–94; *see also* May 2013 IEP 3, 6.)

Plaintiffs chose to keep T.C. at Prospect for the 2013-2014 school year. (Tr. 953–54.)[12] According to Dr. Raymond's testimony, for the 2013-2014 school year, T.C. was in a classroom with six students; however, T.C. received instruction in smaller groups for certain subjects. (*Id.* 1122.) For instance, for literacy and math, T.C. was grouped with only one other student. (*Id.*) Dr. Raymond also testified that the students that T.C. was grouped with for literacy and math had similar functioning levels to T.C. and were working on similar skills. (*Id.* at 1123–24.) T.C. did not have a social skills group at Prospect that year. (*Id.* at 1125.)

---

[12] Plaintiffs signed an enrollment contract for T.C. to attend Prospect for the 2013-2014 school year on March 14, 2013, (Ex. BBBB at 2), which was before the May 2013 IEP was finalized.

2.  Due Process Complaint

Plaintiffs filed their initial due process complaint on June 25, 2013 and filed an amended

due process complaint on August 23, 2013.  (Def.'s 56.1 ¶ 2; *see also* Ex. A.)  The amended

process complaint sought tuition reimbursement for the 2012-2013 and 2013-2014 school years.

(Ex. A at 7.)

a.  Impartial Hearing Officer's Decision

The impartial hearing was conducted on October 30, 2013, November 25, 2013,

November 26, 2013, December 12, 2013, January 17, 2014, March 28, 2014, and April 2, 2014.

(Def.'s 56.1 ¶ 3.)  By decision dated July 7, 2014, the Impartial Hearing Officer ("IHO") found

that the District failed to offer T.C. a free appropriate public education for either the 2012-2013

or 2013-2014 school years.  (IHO Op. 19.)  While the IHO concluded that the goals and

objectives in both the June 2012 IEP and May 2013 IEP were appropriate and that T.C. was not

denied a free appropriate public education based on the specific group of students he would have

been placed with in the proposed class, (*id.* at 19–20), the IHO concluded that the District's

offered 12:1:2 special class "was too large to meet T.C.'s individual needs," (*id.* at 19).  More

specifically, the IHO determined that T.C.'s "significant attention issues," which "require[d]

constant redirection," could not be addressed in a 12:1:2 class.  (*Id.*)

The IHO further found that Plaintiffs' unilateral placement of T.C. at Prospect was

appropriate, (*id.* at 20–23), because Prospect provided T.C. "with educational instruction that

was specially designed to meet his unique education needs," (*id.* at 23).  However, the summer

program, which was offered to general education students as well as students with disabilities,

16

was found to not be an appropriate private placement.  (*Id.* at 23.)  Finally, the IHO also

concluded that equities supported reimbursement of Plaintiffs.  (*Id.* at 23–24.)  Accordingly, the

IHO ordered that the District reimburse Plaintiffs for the annual tuition at Prospect for the 2012-

2013 and 2013-2014 school years.  (*Id.* at 24.)  The IHO denied Plaintiff's request for

reimbursement for the summer session at Prospect.  (*Id.*)

### b.  State Review Officer's Decision

On or about August 4, 2014, the District appealed the IHO's decision to the State Review

Officer ("SRO").  (Def.'s 56.1 ¶ 86.)  On October 9, 2014, the SRO issued a decision sustaining

the District's appeal and reversing the IHO's reimbursement order.  (*See* State Review Officer

Decision ("SRO Op.") 1, 17.)

The SRO first noted that Plaintiffs "d[id] not appeal the IHO's adverse determinations

with respect to the composition of the June 2012 CSE, the appropriateness of the annual goals

contained in the IEPs at issue, the functional grouping of the students in the proposed classroom,

or the appropriateness of the summer program at Prospect."  (*Id.* at 11.)  Accordingly, the SRO

found that those determinations had become final and binding and were thus not reviewed.  (*Id.*)

The SRO then concluded that the District offered T.C. a free appropriate public education

for the 2012-2013 and 2013-2014 school years.  (*Id.* at 15–16.)  Specifically, the SRO's opinion

was limited to the issue of whether the 12:1:2 special class provided for in the June 2012 IEP and

May 2013 IEP was appropriate.  (*Id.* at 11.)  The SRO concluded that the class size, "along with

a substantial array of related services and other supports, as well as a modified curriculum, was

tailored to meet [T.C.'s] individual special education needs."  (*Id.* at 15–16.)  With respect to

17

T.C.'s attention and distractibility issues, the SRO found that the hearing record showed that

such issues were "manageable through recommended strategies and medication." (*Id.* at 15.)

Because the SRO determined that the District offered a free appropriate public education, the

SRO did not reach the questions of whether Plaintiffs' placement of T.C. at Prospect was

appropriate or whether the equities supported an order of reimbursement. (*Id.* at 17.)

### B.  Procedural History

Plaintiffs initiated this Action on January 30, 2015. (*See* Compl. (Dkt. No. 1).)

Plaintiffs' Complaint asks that the Court set aside the SRO's decision, reinstate the IHO's

decision, and grant Plaintiffs' claims for tuition reimbursement for the years at issue, as well as

attorneys' fees and other related relief. (*See* Compl. 22–23.) On August 24, 2015, Plaintiffs

moved for summary judgment. (*See* Dkt. No. 10; *see also* Pls.' Mem. of Law in Supp. of Cross-

Mot. for Summ. J. ("Pls.' Mem.") (Dkt. No. 12); Pls.' Mem. of Law in Opp'n to Def.'s Cross-

Mot. for Summ. J. ("Pls.' Reply Mem.") (Dkt. No. 17).) On September 23, 2015, the District

cross-moved for summary judgment, and asked the Court to dismiss the Complaint because the

District has no duty to provide any tuition reimbursement to Plaintiffs. (*See* Dkt. No. 15; *see

also* Def.'s Mem.; Def.'s Mem. of Law in Reply to Pls.' Opp'n & in Further Supp. of Def.'s

Cross-Mot. for Summ. J. ("Def.'s Reply Mem.") (Dkt. No. 19).) The Parties rely exclusively on

the administrative record, having submitted no additional evidence.[13] The Court held oral

argument on February 10, 2016. (*See* Dkt. (minute entry for Feb. 10, 2016).)

---

[13] While the Parties did submit competing Rule 56.1 statements, those statements drew
exclusively from the administrative record. (*See* Def.'s 56.1; Pls.' Local Civil Rule 56.1
Statement of Material Facts Not in Dispute ("Pls.' 56.1") (Dkt. No. 11).)

## II.  Discussion

### A.  Statutory Background

The IDEA requires that states receiving federal funds provide a "free appropriate public education" to "all children with disabilities."  20 U.S.C. § 1412(a)(1)(A); *see also Bd. of Educ. v. Rowley*, 458 U.S. 176, 179 (1982) (describing the IDEA's predecessor statute as an "ambitious federal effort to promote the education of handicapped children").  A school district within such a state provides a free appropriate public education (or "FAPE") when it offers "special education and related services tailored to meet the unique needs of a particular child, [which are] 'reasonably calculated to enable the child to receive educational benefits.'"  *Walczak v. Fla. Union Free Sch. Dist.*, 142 F.3d 119, 122 (2d Cir. 1998) (citation and internal quotation marks omitted) (quoting *Rowley*, 458 U.S. at 207).  These services are set forth in the child's IEP, "the central mechanism by which public schools ensure that their disabled students receive a free appropriate public education."  *Polera v. Bd. of Educ.*, 288 F.3d 478, 482 (2d Cir. 2002); *see also* 20 U.S.C. § 1414(d)(1)(A)–(B), (d)(3) (setting out requirements for IEPs and their development).

"The IDEA does not itself articulate any specific level of educational benefits that must be provided through an IEP."  *M.H. v. N.Y.C. Dep't of Educ.*, 685 F.3d 217, 245 (2d Cir. 2012).  Rather, the statute ensures an "appropriate" education, but "not one that provides everything that might be thought desirable by loving parents."  *Walczak*, 142 F.3d at 132 (internal quotation marks omitted).  "[A] school district fulfills its substantive obligations under the IDEA if it provides an IEP that is 'likely to produce progress, not regression,' and if the IEP affords the student with an opportunity greater than mere 'trivial advancement.'"  *Cerra v. Pawling Cent.*

19

*Sch. Dist.*, 427 F.3d 186, 195 (2d Cir. 2005) (quoting *Walczak*, 142 F.3d at 130).  Indeed, the IDEA does not require schools to "maximize the potential" of students with disabilities, but instead was intended "more to open the door of public education to handicapped children on appropriate terms than to guarantee any particular level of education once inside."  *M.H.*, 685 F.3d at 245 (internal quotation marks omitted).

In New York, if a parent disagrees with an IEP prepared by a school district, the parent may challenge the IEP by requesting an "[i]mpartial due process hearing," 20 U.S.C. § 1415(f), before an IHO appointed by a local school board, *see* N.Y. Educ. Law § 4404(1)(a).  The IHO's decision may be appealed to an SRO, *see* 20 U.S.C. § 1415(g); N.Y. Educ. Law § 4404(2), and the SRO's decision may be challenged in either state or federal court, *see* 20 U.S.C. § 1415(i)(2)(A); *see also M.H.*, 685 F.3d at 224–26 (generally describing the IHO and SRO process).

The Supreme Court has repeatedly held that if a state fails in its obligation to provide a disabled child a FAPE under the IDEA, the IDEA permits parents to seek reimbursement from school districts for the private placement of the child.  *See Forest Grove Sch. Dist. v. T.A.*, 557 U.S. 230, 246–47 (2009); *Florence Cty. Sch. Dist. Four v. Carter ex rel. Carter*, 510 U.S. 7, 12 (1993); *Sch. Comm. of Burlington v. Dep't of Educ.*, 471 U.S. 359, 369 (1985).  The IDEA allows a district court hearing civil actions brought under the IDEA to grant "such relief as the court determines is appropriate."  *Forest Grove*, 557 U.S. at 237 (quoting 20 U.S.C. § 1415(i)(2)(C)(iii)).  However, parents who unilaterally withdraw their child from the public

schools in favor of a private placement do so at their own financial risk.  *See A.C. ex rel. M.C. v. Bd. of Educ.*, 553 F.3d 165, 171 (2d Cir. 2009).

In deciding whether tuition reimbursement for such a private placement is warranted, a court must first consider (1) whether "the state has complied with the procedures set forth in the IDEA," and (2) whether the IEP developed "through the [IDEA]'s procedures is reasonably calculated to enable the child to receive educational benefits."  *Cerra*, 427 F.3d at 192 (alteration and internal quotation marks omitted).  If the answer to these questions is yes, no reimbursement is permissible.  *See id.* ("If these requirements are met, the State has complied with the obligations imposed by Congress and the courts can require no more." (internal quotation marks omitted)).  If no, the court then considers (3) whether "the private schooling obtained by the parents is appropriate to the child's needs."  *See id.* (internal quotation marks omitted); *see also T.Y. v. N.Y.C. Dep't of Educ.*, 584 F.3d 412, 417 (2d Cir. 2009).  If it is, "equitable considerations" must "support the [parents'] claim."  *A.D. v. Bd. of Educ.*, 690 F. Supp. 2d 193, 205 (S.D.N.Y. 2010); *see also Frank G. v. Bd. of Educ.*, 459 F.3d 356, 363–64 (2d Cir. 2006) ("'[E]quitable considerations [relating to the reasonableness of the action taken by the parents] are relevant in fashioning relief.'" (second alteration in original) (quoting *Burlington*, 471 U.S. at 374)).  Because the Court may order "such relief" as it deems "appropriate," 20 U.S.C. § 1415(i)(2)(C)(iii), and because a reimbursement award is discretionary, *see* 20 U.S.C. § 1412(a)(10)(C)(ii) ("[A] court or a hearing officer may require the agency to reimburse the parents for the cost of [private] enrollment . . . ."), the Court "enjoys broad discretion in considering equitable factors relevant to fashioning relief," *Gagliardo v. Arlington Cent. Sch.*

*Dist.*, 489 F.3d 105, 112 (2d Cir. 2007) (citing *Carter*, 510 U.S. at 16); *see also, e.g.*, *E. Z.-L. ex rel. R.L. v. N.Y.C Dep't of Educ.*, 763 F. Supp. 2d 584, 595 (S.D.N.Y. 2011) (same); *M.H. v. N.Y.C. Dep't of Educ.*, 712 F. Supp. 2d 125, 148 (S.D.N.Y. 2010) (same), *aff'd*, 685 F.3d 217 (2d Cir. 2012).

B.  Standard of Review

Unlike with an ordinary summary judgment motion, the existence of a disputed issue of material fact will not necessarily defeat a motion for summary judgment in the IDEA context. *See, e.g.*, *T.P. ex rel. S.P. v. Mamaroneck Union Free Sch. Dist.*, 554 F.3d 247, 252 (2d Cir. 2009) (per curiam); *Viola v. Arlington Cent. Sch. Dist.*, 414 F. Supp. 2d 366, 377 (S.D.N.Y. 2006).  Instead, summary judgment in IDEA cases is "in substance an appeal from an administrative determination, not a summary judgment."  *Lillbask ex rel. Mauclaire v. State of Conn. Dep't of Educ.*, 397 F.3d 77, 83 n.3 (2d Cir. 2005) (internal quotation marks omitted).

This posture means that this Court owes "a significant degree of deference to the state educational agency, as [it is] essentially acting in an administrative-law-style capacity."  *Mr. & Mrs. P. ex rel. P. v. Newington Bd. of Ed.*, 546 F.3d 111, 118 (2d Cir. 2008).  The Court must "give 'due weight' to [the administrative] proceedings, mindful that the judiciary generally 'lack[s] the specialized knowledge and experience necessary to resolve persistent and difficult questions of educational policy.'"  *Gagliardo*, 489 F.3d at 113 (second alteration in original) (quoting *Rowley*, 458 U.S. at 206); *see also Cerra*, 427 F.3d at 191 (the "IDEA's statutory scheme requires substantial deference to state administrative bodies on matters of educational policy").  While a reviewing court must "engage in an independent review of the administrative

record and make a determination based on a preponderance of the evidence," *M.H.*, 685 F.3d at 240 (internal quotation marks omitted), such review "is by no means an invitation to the courts to substitute their own notions of sound educational policy for those of the school authorities which they review," *Rowley*, 458 U.S. at 206.  Rather, the standard for reviewing administrative determinations "requires a more critical appraisal of the agency determination than clear-error review . . . but . . . nevertheless[] falls well short of complete de novo review. . . . [I]n the course of th[is] oversight, the persuasiveness of a particular administrative finding, or the lack thereof, is likely to tell the tale."  *M.H.*, 685 F.3d at 244 (alterations in original) (italics and internal quotation marks omitted) (quoting *Lenn v. Portland Sch. Comm.*, 998 F.2d 1083, 1086–87 (1st Cir. 1993)).

"'Deference is particularly appropriate when . . . the state hearing officers' review has been thorough and careful.'"  *Mr. & Mrs. P. ex rel. P.*, 546 F.3d at 118 (alteration in original) (quoting *Walczak*, 142 F.3d at 129).  Specifically,

> [t]he deference owed to an SRO's decision depends on the quality of that opinion.
> Reviewing courts must look to the factors that "normally determine whether any
> particular judgment is persuasive, for example, whether the decision being
> reviewed is well-reasoned, and whether it was based on substantially greater
> familiarity with the evidence and the witnesses than the reviewing court."

*R.E. v. N.Y.C. Dep't of Educ.*, 694 F.3d 167, 189 (2d Cir. 2012) (quoting *M.H.*, 685 F.3d at 244); *see also M.H.*, 685 F.3d at 241 ("The SRO's or IHO's factual findings must be 'reasoned and supported by the record' to warrant deference." (quoting *Gagliardo*, 489 F.3d at 114)). Additionally, the Second Circuit has instructed courts that deference to an SRO's decision is more appropriate when the substantive adequacy of an IEP, as opposed to the procedural

adequacy, is at issue; when the decision involves a dispute over an appropriate educational methodology versus determinations regarding objective indications of progress; and when the district court's decision is based solely on the administrative record that was before the SRO. *M.H.*, 685 F.3d at 244.[14]

Where, as here, the IHO and SRO reach contrary conclusions, "reviewing courts are not entitled to adopt the conclusions of either state reviewer according to their own policy preferences or views of the evidence; courts must defer to the reasoned conclusions of the SRO as the final state administrative determination." *Id.* at 246; *see also A.C. ex rel. M.C.*, 553 F.3d at 171 (noting that "if the SRO's decision conflicts with the earlier decision of the IHO, the IHO's decision may be afforded diminished weight," because the court must "defer to the final decision of the state authorities" (internal quotation marks omitted)).  However, if the Court concludes that

> the SRO's determinations are insufficiently reasoned to merit . . . deference, and in particular where the SRO rejects a more thorough and carefully considered decision of an IHO, it is entirely appropriate for the court, having in its turn found the SRO's conclusions unpersuasive even after appropriate deference is paid, to consider the IHO's analysis.

*M.H.*, 685 F.3d at 246.  Therefore, this Court "must defer to the SRO's decision on matters requiring educational expertise unless it concludes that the decision was inadequately reasoned, in which case a better-reasoned IHO opinion may be considered instead."  *R.E.*, 694 F.3d at 189; *see also C.L. v. N.Y.C Dep't of Educ.*, No. 12-CV-1676, 2013 WL 93361, at *5 (S.D.N.Y. Jan. 3,

---

[14] In *M.H.*, the Second Circuit offered some illustrative examples of the categories where administrative judges may have greater institutional competence.  *See M.H.*, 685 F.3d at 244; *see also R.E.*, 694 F.3d at 189.

2013) ("[T]he Second Circuit [has] explained that the deference owed to an SRO's decision depends on the quality of that opinion, or its persuasiveness." (citation and internal quotation marks omitted)), *aff'd*, 552 F. App'x 81 (2d Cir. 2014).

C.  Application

As noted above, to recover on their tuition reimbursement claim, Plaintiffs must demonstrate that the District failed to offer T.C. a free appropriate public education, that their unilateral placement of T.C. was appropriate, and that the equities support reimbursement.

1.  Whether the IEPs Offered T.C. a Free Appropriate Public Education

The Court must first assess whether "the state has complied with the procedures set forth in the IDEA," and whether the IEP developed "through the [IDEA]'s procedures is reasonably calculated to enable the child to receive educational benefits," *Cerra*, 427 F.3d at 192 (alterations and internal quotation marks omitted).  The IHO and SRO reached differing conclusions as to the substantive adequacy of the June 2012 and May 2013 IEPs.[15]  The IHO concluded that the class size was "too large" to meet T.C.'s individual needs because T.C. requires a small structured class that provides the opportunity for small group or one-to-one instruction in his core academic subjects and constant redirection of T.C. when his attention fades.  (IHO Op. 19.)  On the other hand, the SRO found that the class size, in conjunction with the additional services and supports provided for in the June 2012 and May 2013 IEPs, "was tailored to meet the student's individual special education needs."  (SRO Op. 15–16.)

---

[15] Because the Court finds that the IEPs at issue were substantively inadequate, the Court does not address Plaintiffs' alternative argument that the IEPs were procedurally inadequate because the recommended program was predetermined.

a.  Whether the SRO Decision Should Be Afforded Deference

As the "final state administrative determination," this Court ordinarily "must defer to the reasoned conclusions of the SRO." *M.H.*, 685 F.3d at 246.  The Court further notes that the core issue at dispute here—the appropriateness of the recommended class size—is a matter of educational policy for which deference is particularly proper.  *See F.O. v. N.Y.C. Dep't of Educ.*, 976 F. Supp. 2d 499, 511 (S.D.N.Y. 2013) ("[C]lass size and instructional programming are matters of educational policy concerning which courts defer to a state administrative officer."); *N.Y.C. Dep't of Educ. v. V.S.*, No. 10-CV-5120, 2011 WL 3273922, at *13 (E.D.N.Y. July 29, 2011) ("[Q]uestions of class size, teaching methodologies[,] and educational environments involve exactly the types of educational policy issues that require district court deference to state administrative agencies.").  "Nonetheless, 'the deference owed to an [administrative] decision depends on the quality of that opinion.'"  *F.O.*, 976 F. Supp. 2d at 511 (alteration in original) (quoting *R.E.*, 694 F.3d at 189).  Specifically, "in situations when an SRO reverses the finding of an IHO, 'the court should give substantial deference to the SRO's views of educational policy, but less to the SRO's factual findings or to its reasoning in general.'"  *Scott ex rel. C.S. v. N.Y.C. Dep't of Educ.*, 6 F. Supp. 3d 424, 441 (S.D.N.Y. 2014) (quoting *B.R. ex rel. K.O. v. N.Y.C. Dep't of Educ.*, 910 F. Supp. 2d 670, 675 (S.D.N.Y. 2012)).  Here, the Court finds significant issues with the SRO's reasoning and analysis.  In particular, while the SRO does cite to some record evidence in his analysis of the issue, as detailed below, the marshaled evidence does not actually lend much, if any, support to the SRO's conclusion.  Accordingly, the Court will not afford deference to the SRO's conclusion that a 12:1:2 class was appropriate for T.C.

26

Specifically, while the SRO conceded that "multiple evaluators noted [T.C.'s] difficulties with attention and distractibility," he found that "the hearing record also includes multiple references to the student's positive response to prompts and cues to help him refocus, as well as a positive response to daily medication for attention and focus." (SRO Op. 14.) The SRO also contended that "the hearing record in this case shows that the student's distractibility was manageable through recommended strategies and medication." (*Id.* at 15.) To support both statements, the SRO cited to two pages of the June 2012 IEP, one page of a 2012 speech and language evaluation, and one page of the 2012 psychological evaluation described above. (*Id.* at 14, 15.) But a review of these citations reveals that they do not mention appropriate class sizes for T.C. and thus provide little support for the SRO's conclusion that the record shows that T.C.'s attention and distractibility issues were manageable to the extent that he could receive educational benefits in a 12:1:2 classroom.

For example, the first cited June 2012 IEP page states that T.C. "required significant prompting from the examiner in order to demonstrate his skills," and that "[f]requent progress probes as well as prompts and cues from the teacher have helped [T.C.] to progress and feel successful." (June 2012 IEP 2.) The Parties do not dispute that T.C. has significant attention issues and that frequent refocusing and prompting is necessary to ameliorate those issues. The question is, however, whether T.C. can receive the necessary amount of refocusing and prompting in a 12:1:2 class. Interestingly enough, these two statements pulled from the June 2012 IEP were both made by professionals that were working with T.C. *in a one-on-one setting*; the former was made by the District teacher that evaluated T.C. in advance of the meeting to

27

determine the June 2012 IEP, and the other was made by Mr. Gorman, T.C.'s teacher at Prospect for the 2011-2012 school year.  (*See id.*)[16]  Neither provides support for the conclusion that T.C.'s attention issues were manageable through the amount of refocusing and redirection that T.C. could expect in a 12:1:2 class.  Also, the only citation to support the SRO's conclusion that T.C.'s distractibility was manageable through medication is to the June 2012 IEP, and states that T.C. "takes daily medication to enhance attention and focus" and that "[m]edication has improved [T.C.'s] attention."  (June 2012 IEP 9.)  There is no elaboration as to the extent of such an improvement and whether that improvement would sufficiently manage T.C.'s attention issues to the point that he could progress in a 12:1:2 class.  *See S.B. v. N.Y.C. Dep't of Educ.*, No. 14-CV-349, 2015 WL 3919116, at *10 (S.D.N.Y. June 25, 2015) (finding that SRO's recommendation regarding a 15:1 classroom size was not well-reasoned and refusing to afford it deference where the evidence cited in support of the conclusion did not "mention or even allude

---

[16] With respect to the SRO's citation to the speech and language evaluation, the Court is at a loss to determine what on the cited page could serve as support for the SRO's conclusion. The only possible candidate would be the statement that T.C. "was cooperative and compliant throughout all testing procedures."  (Ex. 9 at 3.)  But the SRO does not explain how such a statement actually supports the conclusion that T.C.'s attention issues could be managed in a 12:1:2 class.  The Court is also unsure of what the SRO cited on page three of the psychological evaluation.  The report does state that "[f]requent breaks and pacing were utilized with refocusing and redirection to help T.C. maintain attention to task."  (Ex. 10 at 3.)  While the statement at least refers to refocusing and redirection efforts, it does not even indicate if such refocusing and redirection attempts were successful.  Second, even assuming they were, the fact that refocusing and redirection can be a successful way to manage T.C.'s attention issues in a one-on-one evaluation setting does not provide support for the conclusion that such strategies could sufficiently neutralize his attention issues in a 12:1:1 class.  *See S.B. v. N.Y.C. Dep't of Educ.*, No. 14-CV-349, 2015 WL 3919116, at *14 (S.D.N.Y. June 25, 2015) (discounting SRO's decision where it "remain[ed] unclear" as to how the SRO drew a conclusion from the evidence cited).

to the appropriate student-to-teacher ratio" for the student and "therefore d[id] not bear on the 15:1 issue").

While the SRO does acknowledge that "multiple evaluators noted [T.C.'s] difficulties with attention and distractibility," (SRO Op. 14), that is the extent of his discussion of such evidence; he does not seriously grapple with such evidence, or explain why such evidence should be discounted or is outweighed by the limited evidence cited in support of his conclusion that T.C.'s attention issues were "manageable," *see Scott ex rel. C.S.*, 6 F. Supp. 3d at 441 (choosing not to afford SRO deference, in part, because the SRO "failed to carefully consider significant evidence" and "failed to address obvious weaknesses and gaps in the evidence"); *see also F.O.*, 976 F. Supp. 2d at 513–14 (noting that, while the SRO "mentioned certain testimony" from the parents' witnesses, the "SRO's opinion failed to consider thoroughly or carefully contrary testimony from [those] witnesses . . . even when that testimony was relied upon by the IHO" and choosing not to afford the SRO's determination any deference).  For example, after her April 2013 observation of T.C., Dr. Stern concluded that "one-to-one instruction" is "an appropriate setting to support [T.C.'s] unique constellation of learning needs," and that "highly individualized instruction" "allows for flexibility in lessons, as well as the opportunity to shift from one activity to another in accordance with [T.C.'s] focus and receptivity."  (Stern 2013 Observation 3.)  Dr. Stern also testified that a class of 12 students "would be an overwhelming environment" for T.C.  (Tr. 679–80.)[17]

---

[17] As the District rightly points out, the question posed to Dr. Stern addressed how T.C. would fare in a classroom with 12 students, one teacher, and one aide, (*see* Tr. 679), while the IEPs at issue in this case provided for a classroom with 12 students, one teacher and *two*

The SRO's conclusion also rested on the determination that a 12:1:2 class size has the same ratio of students to adults as an 8:1:1 ratio (one adult to every four students), as was recommended in Dr. Dorta's report. (SRO Op. 14–15.) But the SRO does not at all engage the question of whether it is only the ratio of students to teachers, and not the total number of students in the classroom, that could materially impact T.C.'s ability to learn given his management needs. *See N.S. v. N.Y.C. Dep't of Educ.*, No. 12-CV-7819, 2014 WL 2722967, at *10 (S.D.N.Y. June 16, 2014) ("When a student benefits from being in a small, less hectic environment, a 12:1:4 classroom is too large where a 6:1:1 program might be appropriate.").[18] The record is replete with references to the fact that T.C.'s poor attention and easy distractibility

---

paraprofessionals. However, Dr. Stern's answer is still relevant to the question of how T.C. would have performed in the District's program because she made clear that her response that such a classroom would be "overwhelming" was based not only on the hypothetical ratio, but also "[b]ecause of the distractions" in "a class that large." (*Id.* at 680.)

[18] Indeed, New York regulations addressing class size for students with varying levels of "management needs," delineate required class sizes on the basis of the maximum number of students, not the maximum ratio between teachers and students. For example, the SRO began his analysis with a citation to 8 N.Y.C.R.R § 200.6(h)(4)(i), which states that "for special classes containing students whose management needs interfere with the instructional process," the maximum class size "*shall not exceed 12 students*, with one or more supplementary school personnel assigned to each class during periods of instruction." *Id.* (emphasis added). For special classes with students "whose management needs are determined to be intensive, and requiring a significant degree of individualized attention and intervention," the maximum class size "*shall not exceed eight students*, with one or more supplementary school personnel assigned to each class during periods of instruction," *id.* § 200.6(h)(4)(ii)(b) (emphasis added), and for special classes with students "whose management needs are determined to be highly intensive, and requiring a high degree of individualized attention and intervention," the maximum class size "*shall not exceed six students*, with one or more supplementary school personnel assigned to each class during periods of instruction," *id.* § 200.6(h)(4)(ii)(a) (emphasis added).

require limiting the availability of various distractions to best allow T.C. to focus.[19]  But the SRO does not engage this evidence—which directly weakens his conclusion that because 12:1:2 and 8:1:1 each reduce to 4:1, the "increase in class size" is "in some respects mitigated."  (*See* SRO Op. 14–15.)[20]

The SRO also justified the District's use of a 12:1:2 class size on the grounds that "no other . . . recent information [other than Dr. Dorta's report] before the June 2012 CSE emphasizes [T.C.'s] need for an educational setting" with small group instruction and one-to-one tutorials.  (*See* SRO Op. 15.)  While the SRO is correct that the documents he cites do not expressly make such recommendations, it is worth noting that none of them make *any* recommendations.  Rather, the documents are reports summarizing evaluations conducted of T.C.  (*See generally* Exs. 8–10, N–O.)  Moreover, while they do not provide recommendations, the documents contain references to T.C.'s attention issues and the need for teachers to frequently monitor, redirect, and refocus T.C.  *See R.E.*, 694 F.3d at 194 ("Even those reports

---

[19] For example, Dr. Stern reported that T.C. was a student "with 'acute hearing' who can be distracted by the presence of noise in his environment and by the fact that he can tend to 'tune into' conversations between his classmates or in the hallways."  (Stern 2013 Observation 3.)  She testified that "[a] distracting room either visually or in terms of noise would certainly tax [T.C.'s] attentional ability and increase his tendency to be distractible," and that T.C.'s distractibility would "certainly . . . be affected by the number of people in the room," because "[m]ore people, more distractions."  (Tr. 673–74.)  Dr. Dorta noted in his report that "[v]erbal directions may often have to be repeated if there are competing background classroom noises."  (Dorta Report 10.)  The District special education teacher that evaluated T.C. in 2012 noted that she "observed [T.C.] to be distracted by things in the environment."  (Tr. 405.)

[20] Also, the Court points out that, despite Dr. Dorta's 2009 recommendation, the IHO did not determine that T.C.'s needs would have been met in an 8:1:1 special class, but rather that "T.C.[] requires one-to-one instruction in his core academic subjects throughout the day."  (IHO Op. 19.)

that did not specifically recommend a 1:1 ratio emphasized that [the student] needed a high level of support."). (*See also, e.g.*, Ex. 8 at 1 ("It was noted throughout several subtests, that [T.C.] demonstrated difficulty sustaining his attention due to weak overall stamina. He often began a task with appropriate focus, but had significant difficulty sustaining focus throughout the subtest. He required *consistent prompting* from the examiner to study items carefully . . . and required *frequent redirection* by the examiner." (emphases added)); *id.* at 3, 5 (noting that "[i]t is clear that [T.C.] . . . requires *extensive adult support* to apply learned skills effectively to complete academic tasks" and that T.C. "required *significant prompting from the examiner* in order to demonstrate his skills" (emphases added)).)[21]

Finally, the SRO makes only two other points in his analysis of the issue. Specifically, he notes that (1) T.C. "was 'able to persevere through difficult tasks and did not shut down' and [his] parents reported that [he] was not only able to complete his homework independently, it was his preference to do so," (SRO Op. 14 (alteration omitted) (quoting June 2012 IEP 2) (citing Tr. 936)), and (2) T.C. had a "relative strength in adaptive behavior skills," (*id.*). Regarding the former, the references to T.C.'s ability to persevere through difficult tasks and his ability/preference to do his homework independently are supported by evidence from T.C.'s experience during his 2011-2012 school year spent at Prospect when he was receiving direct one-

---

[21] Additionally, the evaluations contained test scores that emphasized T.C.'s attention issues. (*See, e.g.*, Ex. N at 2 ("[T.C.] received a standard score of 45 on this subtest placing him below the 1st percentile for fine motor coordination skills. This assessment requires sustained attention in addition to refined fine motor coordination skills."); Ex. 10 at 4 (explaining T.C.'s score on a test placing him in the 0.2 percentile: "It should be noted that the Processing Speed subtests may be impacted by the student's attention to task and interest in the activity.").)

on-one instruction.[22]  Regarding the latter, the SRO does not actually explain how T.C.'s

behavior skills would help him progress in a 12:1:2 class.  Indeed, there is evidence in the record

that cuts in the other direction; specifically, witnesses and evaluators have noted that, given that

he seeks to please adults (*see, e.g.*, Tr. 800), T.C. may quietly "sit and wait" and "shut down"

while teachers attend to other students that have similar needs as him, (*see id.* at 1086–87; *see*

*also* Stern 2013 Observation 4 (noting that T.C. "proved capable of 'fading into the woodwork'

as a passive way of withdrawing from a lesson")).  The SRO did not consider this aspect of

T.C.'s behavioral skills and did not consider how T.C.'s inclination to wait quietly and shut

down or fade into the woodwork could be exacerbated in a larger class, especially one where

other students have significant behavioral issues that also require intensive teacher support.  (*See,*

*e.g.*, Tr. 680–81, 1086–87.)[23]

    The Court thus finds that the SRO's decision is not sufficiently well-reasoned, thorough,

or persuasive enough to warrant deference.  Accordingly, the Court next considers whether the

IHO's decision warrants deference.

_____

    [22] The perseverance point is pulled from Mr. Gorman's description of T.C.'s performance
at Prospect during the June 14, 2012 CSE meeting.  (*See* June 2012 IEP 2.)  With respect to
T.C.'s homework completion, the SRO relies on S.C.'s testimony describing T.C.'s time at
Prospect.  (*See* Tr. 936.)  Indeed, S.C. testified that during T.C.'s time at the District (around
second grade), T.C. "couldn't do the homework that was sent home with him."  (*Id.* at 812.)

    [23] Although the IHO concluded that, "[w]ith respect to the issue of grouping T.C[.] with
students of similar needs and abilities . . . the evidence does not support a finding that T.C.
would have been denied a FAPE had he been grouped with [the] students," (IHO Op. 20), and
Plaintiffs did not appeal that finding, that finding does not prevent consideration of how the
needs of the other students would bear on T.C.'s distractibility or the availability of teachers in

b.  Whether the IHO Decision Should Be Afforded Deference

As noted above, the IHO determined that the District failed to provide a free appropriate

public education for T.C. for the 2012-2013 and 2013-2014 school years.  (*See* IHO Op. 18–20.)

Specifically, the IHO found that the 12:1:2 class size recommended for each year "was too large

to meet T.C.'s individual needs" because "the evidence clearly show[ed] that T.C.[] requires

one-to-one instruction in his core academic subjects throughout the day."  (*Id.* at 19.)  The IHO

relied primarily on Dr. Stern's and Dr. Dorta's reports, as well as the testimony of Dr. Stern.

(*See id.* at 18–19.)

At the outset, the Court finds puzzling Plaintiffs' insistence that the IHO's decision was

founded upon T.C.'s lack of progress at the District.  (*See, e.g.*, Pls.' Mem. 10 ("[T]he IHO's

decision was grounded in the district's offer of the same [12] student and one teacher program

for seven years and [T.C.'s] inability to make progress in that program for four years."); Pls.'

Reply Mem. 5 ("[T]he IHO examined the appropriateness of the district program in light of the

child's history in the district['s] 12 student one teacher program."); *id.* at 6 (noting "the IHO's

conclusion that T.C. failed to make progress in the district's" 12 student program).)  Indeed,

Plaintiffs provide two block quotes from the IHO's decision which allegedly demonstrate that

the IHO's decision was "based on the child's past history of non-progress" at the District.  (Pls.'

Mem. 10–11.)  Specifically, Plaintiffs point to the following language:

> On January 26, 2010, the CSE met and reviewed Dr. Dorta's [December 2009]
> report (Ex[.] CCC [at] 5).  The IEP notes that T.C. requires individual attention to
> approach academic tasks, but noted that he made progress in reading, writing[,]
> and math (Ex[.] CCC [at] 5).  The CSE indicated that the results of Dr. Dorta's

---

the classroom to provide the intensive support necessary for him to progress.

> evaluation revealed significant cognitive, motor[,] and language needs.  However, the CSE did not recommend any changes to his current program (Ex[.] CCC, [at] 5).
>
> ***
>
> Dr. Dorta, who was the neuropsychologist who evaluated T.C. in 2009, recommended that T.C. be placed in a 'highly structured,' 8:1:1 class for third grade for all core subjects with direct instruction, repetition[,] and review.  He also recommended that T.C. be taught in a small group of three students with a one-to-one tutorial using the same approach; noting that 'consistency' was critical (Ex[.] AA [at] 8).  Significantly, the evidence shows that the CSE reviewed this report yet declined [to] offer T.C. a smaller class and/or individual instruction for the 2011-2012 or the 2012-2013 school years.

(*Id.* at 11 (some alterations in original) (citing IHO Op. 8, 18–19).)  Not only is there very little discussion of progress in the above quotes, the one vague reference to progress actually indicates that it was noted at the January 26, 2010 meeting that T.C. had *made progress.*  Further, while it is no doubt correct that the IHO, in its "Findings of Fact," did detail various test scores, including those generated in Dr. Dorta's report, and referred to some of T.C.'s District report cards, (*see* IHO Op. 7–9), the Court sees no ultimate determination or finding based on those scores as to the extent to which T.C. progressed or regressed in his four years at the District.  Especially here, where there has been ample evidence demonstrating the inconsistencies in T.C.'s progress and testing (*see, e.g.*, Stern 2013 Observation 3; Tr. 1077), the Court is not willing to conclude that the IHO came to an implicit conclusion about T.C.'s progress based on his listing of test scores before engaging in any analysis.  Additionally, the portion of the IHO's opinion containing actual analysis as to why, in his view, the District failed to provide a free appropriate public education (including the portion cited by Plaintiffs) does not contain *any* allusions to the

earlier cited test scores specifically, or T.C.'s progress, or lack thereof, more generally.  (*See* IHO Op. 18–19.)[24]

---

[24] Accordingly, the Court is not persuaded by Plaintiffs' argument that the Court should choose to afford deference to the IHO's decision over that of the SRO for the reason that the IHO considered evidence—T.C.'s progress—that the SRO did not consider.  Indeed, as the District points out, the SRO's decision references many of the same test scores cited in the IHO's opinion.  (*See* Def.'s Reply Mem. 2–3; *see also* SRO Op. 12–13 & n.7.)  As with the IHO, these scores and markers of progress or regression did not expressly factor into the SRO's analysis and determination.  The only difference is that the SRO expressly stated as much.  (*See* SRO Op. 15.)

On the question of progress, the District contends that T.C. made progress in his final year at the District (the 2010-2011 school year), which further supports the appropriateness of the June 2012 IEP and a 12:1:2 class size.  (*See* Def.'s Mem. 15–16.)  The District relies chiefly on a June 2011 progress report which, it insists, "demonstrates that T.C. made reasonable progress in the District's program," because "of the [32] goals that were reported for the full year . . . T.C. achieved [13], and was progressing satisfactorily on the remaining [19]."  (*Id.* (citing Ex. 20).)  More specifically, "[o]f the [13] goals for which the special education teacher was responsible . . . T.C. achieved seven of the goals and was progressing satisfactorily on the remaining six."  (*Id.* at 16.)

First, although "administrative agencies have special expertise in making judgments concerning student progress," *Cerra*, 427 F.3d at 195, the Court points out that neither the SRO, nor the IHO, considered whether the June 2011 progress report established that T.C. made material progress at the District.  Second, the Court is not convinced that the June 2011 progress report provides any conclusive answer regarding progress, especially when considered alongside other District report cards and interim reports.  Specifically, T.C.'s report cards for the school years 2008-2009, 2009-2010, and 2010-2011 indicate that the vast majority of T.C.'s academic skills were either "beginning" or "developing" and that almost zero were "secure" or even "approaching secure."  (*See* Exs. B–D.)  Indeed, not a single skill from T.C.'s core academic studies was "approaching secure" at the end of his 2010-2011 school year.  (*See* Ex. D at 1–2.)  Further, a May 2011 interim report towards the end of that school year contains a simple chart entitled "Academic Progress," which lists subjects of reading, communication, math, social studies, science, and health, and provides two columns, one for "Making appropriate progress," and one for "Requires additional teacher support."  (*See* Ex. E at 2.)  T.C.'s chart has no check marks in the column that would indicate T.C. is making appropriate progress and instead has checks for each subject in the column indicating that T.C. "[r]equires additional teacher support."  (*Id.*)  Indeed, another interim report from a few months earlier contains the same allocation of check marks and expressly notes that the additional teacher support is required at times "to stay focused."  (*Id.* at 1.)  The District also points to some of Plaintiffs' "contemporaneous writings conced[ing] that T.C. was progressing while attending the 12:1+1 special class in the District."  (Def.'s Mem. 16 (citing Ex. 22).)  When asked about these writings (which generally consisted

36

However, after an independent review of the evidence, the Court finds that the IHO's

decision regarding the substantive inadequacy of the June 2012 and May 2013 IEPs is supported

by sufficient evidence in the record and "accordingly merits deference."  *D.N. ex rel. G.N. v.

N.Y.C. Dep't of Educ.*, No. 14-CV-2526, 2015 WL 925968, at *17 (S.D.N.Y. Mar. 3, 2015).

While the IHO's actual analysis of the class-size issue, like that of the SRO, is not particularly

extensive, the Court finds that the evidence relied upon by the IHO is more directly connected to

a determination regarding whether the District's proposed class size could yield progress for T.C.

than the evidence cited by the SRO.

For example, the IHO cites to Dr. Dorta's report which repeatedly emphasizes the need to

"address [T.C.'s] attentional difficulties."  (Dorta Report 10.)  Dr. Dorta's report contains

numerous recommendations and statements that provide support for the IHO's conclusion that

T.C. required a smaller class and one-to-one instruction to ensure that his attention and

distractibility problems did not render him unable to receive educational benefits.  Most directly,

Dr. Dorta recommended a class with no more than eight students, as well as "[s]mall group

work" for reading, "ideally with no more than [three] children in a group," which "should be

accompanied by *one-on-one tutorials*" and noted that "*consistency* is critical."  (*Id.* at 8.)[25]  But

---

of emails between Plaintiffs and T.C.'s District teachers), S.C. explained that the progress
referred to in those emails was never sustained but rather consisted only of occasional "flares."
(Tr. 990–91, 1014–15.)

[25] The SRO noted Dr. Dorta's recommendation for one-to-one instruction, but stated that
"[t]he IDEA does not require a [CSE] to adopt the particular recommendation of an expert," but
rather "only requires that that recommendation be considered in developing the IEP."  (SRO Op.
15 (second alteration in original) (internal quotation marks omitted).)  While a correct statement
of the law, that proposition is not a justification for failing to actually analyze or weigh the

even beyond that explicit recommendation for a smaller class and small group instruction, other recommendations further support the IHO's conclusion. Dr. Dorta's fourth recommendation advocates for a number of strategies to address T.C.'s attention difficulties, including "[c]arefully monitor[ing] the *amount* of material presented as well as the rate of presentation," and "[m]onitor[ing] fading attention and motor overflow carefully" by "look[ing] for signs of overload." (*Id.* at 10.) The more students in a classroom that a teacher is responsible for, the more difficult it is for T.C. to be carefully monitored as recommended. Dr. Dorta also recommended "lead[ing] [T.C.] through each step of the first example of the actual assignment." (*Id.*) But the larger T.C.'s instruction group is, the less likely it is that the instructor would have the opportunity to convey directions to T.C. in such a time-intensive manner. And the greater the number of students in T.C.'s class, the more significant the risk of distraction (*see* Tr. 673–74), which could exacerbate the issues described above.

Additionally, Dr. Stern's testimony, which was expressly cited by the IHO, likewise supports the IHO's conclusion. Dr. Stern testified that, while she was successfully able to "recognize and respond" to T.C.'s fading focus, the same might not be possible in certain classroom environments. (Tr. 665–66.) In a classroom environment, T.C.'s behavioral cues indicating slipping focus or attention "may not be immediately recognized." (*Id.* at 666.) If those cues are not recognized and he is allowed to "fad[e] into the woodwork," T.C. would not reengage with an activity; accordingly, the instructor "ha[s] to work hard to reengage him." (*Id.*)

---

opinions and testimony of such experts. *See F.O.*, 976 F. Supp. 2d at 514 (finding that an SRO cannot "insulate [himself] from analyzing contrary testimony or evidence" by noting that the CSE was not required to adopt the recommendations of a particular expert).

Dr. Stern also testified that a 12-student classroom would be "overwhelming" for T.C. because of the need for greater teacher attention, as well as the added distractions that come with the addition of more students in one classroom.  (*Id.* at 679–80.)[26]

Dr. Stern's 2010 report reinforced the points she made in her testimony.  The report noted that:  (1) T.C. "is prone to becoming preoccupied or 'stuck' on a certain thought[], to such a degree that it may serve as a true source of distraction," (2) during T.C.'s evaluation, he "did not seek out clarifications or ask that information be repeated, but rather sat in a compliant manner and at times seemed to try to 'fade into the woodwork,'" and (3) T.C. "present[ed] with fluctuating attention" which "require[d] a high degree of structure, redirection to the task at hand, and frequent breaks to assure his meaningful task involvement."  (Stern 2010 Report 6 (emphasis

---

[26] Additionally, the fact that there were a number of students in T.C.'s proposed class that had significant management needs further supports the conclusion that teachers in T.C.'s proposed 12:1:2 class would not have been able to monitor, redirect, and refocus T.C. enough to ensure that he could attain any educational benefits, at least for the May 2013 IEP, because the group of students that would be in T.C.'s class was discussed at that meeting.  (*See* Tr. 86 (noting that Ex. 14, which contained profiles of students expected to be in T.C.'s District class, was given to Plaintiffs after the June 14, 2012 CSE meeting); *id.* at 253–54, 325 (at the May 31, 2013 CSE meeting Ms. Mellon knew which students would be in her upcoming class); May 2013 IEP 2 (noting discussion of T.C.'s potential class, including that the students have a "variety of disabilities," and recording Plaintiffs' "concerns about the other students in the classroom, particularly behavioral concerns").)  The collection of student profiles demonstrates that a number of the students that T.C. would have shared his classroom with at the District had significant behavioral issues.  (*See, e.g.*, Ex. 14 at 6 ("This student demonstrates significant behavioral needs including the need for redirection and attention to task."); *id.* at 12 ("This student requires significant extra teacher support due to frequent display[s] of avoidance behaviors, especially while adjusting to new situations."); *id.* at 25 ("This student demonstrates management needs due to effects of his ADHD. . . . He needs prompting and direction into the daily activities in school.  He requires additional teacher support and close teacher proximity in order to address his management needs.  Student has difficulty following 2-3 step directions and requires consistent teacher cueing to stay focused."); *id.* at 28 ("Student demonstrates difficulty with attention[,] particularly in the afternoon.").)

omitted).)  As such, Dr. Stern concluded that "a number of factors, including[] variable attention, tendency for (both internal and external) distractibility, and his extremely slow processing, greatly interfere with [T.C.'s] acquisition of information at the level of initial learning."  (*Id.* at 13.)  It is not surprising, then, that Dr. Stern advised that it would be "critical to focus on [T.C.'s] *availability for learning*, which will involve a careful accommodation of his slow processing, attention issues, and tendency to fatigue," and that teaching must be "target[ed] . . . to when [T.C.] is *able to take in information*" in order to "establish a base of academic skill," which will "most certainly involve significant review and repetition of information to assure that [T.C.] establishes a solid foundation that can be built upon."  (*Id.* at 14.)  All this supports Dr. Stern's recommendation that it was "very important" that T.C.'s classroom be structured in a way that maintains his attention, including through "frequent[]" check-ins by teachers and "direct assistance in 'getting started'" with tasks.  (*Id.* at 17.)  Dr. Stern's observations, conclusions, and recommendations, emphasizing greater teacher monitoring and active involvement during instruction of T.C. to address his attentional and focus issues, support the IHO's determination.[27]

---

[27] Other reports and evaluations, beyond Dr. Dorta's and Dr. Stern's, including those of District representatives, also emphasized T.C.'s attention issues.  For example, in her 2012 educational evaluation, Susan Hirsch noted that "throughout several subtests, [T.C.] demonstrated difficulty sustaining his attention due to weak overall stamina," and that he "had significant difficulty sustaining focus throughout [a] subtest" and "required consistent prompting from the examiner" and "frequent redirection by the examiner."  (Ex. 8 at 1.)  She added that T.C. "required extensive support, refocusing, and prompting in order to demonstrate his academic abilities" during the evaluation, "require[d] extensive adult support to apply learned skills effectively to complete academic tasks," and "evidence[d] weak stamina and weak ability to follow through with the steps of a task independently."  (*Id.* at 2, 3, 5.)  She also testified that, based on her evaluation of T.C., it was clear to her that T.C. had stamina issues and would need "significant prompting from [a] teacher" to be successful with a task.  (Tr. 405–06.)

As Dr. Stern's report and testimony show, T.C.'s need for more individualized instruction resulted from more than his attention and distractibility problems. For example, Dr. Stern concluded that T.C.'s "complex constellation of issues" would "require a flexible approach to teaching and a program that incorporates a variety of teaching methods," as well as the ability to assess the efficacy of a program in order to determine which teaching methods and approaches work best for him, (Stern 2010 Report 16), which would allow for an "educational program uniquely designed to support him and his needs," (Tr. 675–76). Further, T.C.'s particularly slow processing speed would mean that he would take longer to execute a task than his peers and so his instruction in a group with too many peers could result in T.C. being out of sync with the classroom program. (*Id.* at 677–78.)[28]

On the other hand, the SRO's analysis relies upon evidence that does not directly bear on whether a class size of 12 students would be too large for T.C. Specifically, as detailed above, most of the evidence cited in the SRO's analysis refers to statements describing T.C. in a one-on-one setting. (*See* SRO Op. 14–15.) The fact that T.C. was "able to persevere through difficult tasks and did not shut down" and was able to do his homework independently, (*id.* at 14

---

[28] The Court notes that while the IHO did not extensively analyze Ms. Mellon's and Ms. Hayes's testimony claiming that the District's placement "could implement a program similar to [Prospect]," (IHO Op. 19), he did acknowledge the testimony, but concluded that the "one-to-one instruction in . . . core academic subjects throughout the day" that T.C. required "would not be possible in [the District's] 12:1:2 class." (*Id.*) This conclusion is supported by the minutes of the June 14, 2012 CSE meeting, which note that Ms. Mellon "commented that the program replicates many of the instructional strategies and activities that have contributed to [T.C.'s] success during the 11/12 school year," and lists a number of things, "such as authentic activities (cooking every Friday), weekly community based activities, academics that are reinforced by hands-on activities and opportunities for mainstreaming," among others. (June 2012 IEP 2–3; *see also* May 2013 IEP 2.) The minutes do not indicate that Ms. Mellon said anything about

(alteration and internal quotation marks omitted)), *while he was enrolled at Prospect, and receiving one-on-one and small group instruction*, does not in any way provide evidence that T.C. could attain an educational benefit in a 12-student classroom.  The same is true of T.C.'s "positive response to prompts and cues to help him refocus," when the SRO's evidence consists of examples of positive responses by T.C. in a one-on-one setting.  (*Id.*)  While one could draw an inference from the fact that medication was said to "improve" T.C.'s attention problems, to conclude that T.C. could make progress in a larger class, there is little elaboration in the record as to T.C.'s use of medication to address the problem.  At bottom, a deeper look at the support cited for the SRO's conclusion that "[a] careful review of the hearing record demonstrates the IHO erred in determining the recommended special education program was insufficient to meet [T.C.'s] significant academic needs," (*id.* (internal quotation marks omitted)), reveals that the finding amounts merely to a "conclusory assertion[] [that] utterly fail[s] to meet the [Second Circuit's] standard," *see B.R. ex rel. K.O.*, 910 F. Supp. 2d at 678; *see also F.O.*, 976 F. Supp. 2d at 514 (same).

Ultimately, upon review of the entire administrative record, the evidence in Plaintiffs' favor, combined with the deference owed to the IHO on his substantive assessment of the appropriateness of the proposed class size, leads the Court to adopt the IHO's determination that the June 2012 IEP and the May 2013 IEP were substantively inadequate.  *See M.H.*, 685 F.3d at 249 (affirming district court's decision "to rely on the IHO's conclusion" on particular issue because "[t]hat decision [wa]s supported by the evidence in the record" while the SRO's

significant opportunities for individual instruction.  (*See* June 2012 IEP 2–3; May 2013 IEP 2.)

"conclusory statement d[id] not evince thorough and well-reasoned analysis that would require deference").

### 2.  Whether Plaintiffs' Unilateral Placement Was Appropriate

Having found that the District failed to provide a free appropriate public education for the school years 2012-2013 and 2013-2014, the Court next must consider whether Plaintiffs' placement of T.C. at Prospect for those two years was appropriate.  *Frank G.*, 459 F.3d at 363–64.  "A private placement is appropriate if it is reasonably calculated to enable the child to receive educational benefits, such that the placement is likely to produce progress, not regression."  *T.K. v. N.Y.C. Dep't of Educ.*, 810 F.3d 869, 877 (2d Cir. 2016) (citations and internal quotation marks omitted).  The Second Circuit has instructed courts making these determinations to "consider the totality of the evidence, including 'grades, test scores, regular advancement, or other objective evidence.'"  *Id.* (quoting *C.L. v. Scarsdale Union Free Sch. Dist.*, 744 F.3d 826, 836 (2d Cir. 2014)).  The "test for the parents' private placement is that it is appropriate, and not that it is perfect."  *C.L.*, 744 F.3d at 837 (internal quotation marks omitted).  Moreover, "[p]arents bear a lower burden to demonstrate the appropriateness of a private placement than school districts do to demonstrate the provision of a FAPE because 'parents are not barred from reimbursement where a private school they choose does not meet the IDEA definition of a [FAPE].'"  *T.K.*, 810 F.3d at 878 (second alteration in original) (quoting *Frank G.*, 459 F.3d at 364.  Finally, "[a] unilateral private placement is only appropriate if it provides 'education instruction *specifically* designed to meet the *unique* needs of a handicapped child.'"  *Gagliardo*, 489 F.3d at 115 (emphasis in original) (quoting *Frank G.*, 459 F.3d at 365).

The SRO did not reach this issue because he concluded that the District provided T.C. with an appropriate education.  (SRO Op. 17.)  Accordingly, the Court will look to the IHO's determination.  *See C.F. ex rel. R.F. v. N.Y.C. Dep't of Educ.*, 746 F.3d 68, 82 (2d Cir. 2014) (noting that it was appropriate to defer to the IHO's decision on the parents' unilateral placement as it was not addressed by the SRO) (citing *M.H.*, 685 F.3d at 252).  The IHO concluded that Prospect "provided [T.C.] with educational instruction that was specially designed to meet his unique education needs and that [Prospect] provided [T.C.] with an educational benefit."  (IHO Op. 23.)  Because, after an independent review of the record, the Court finds that the IHO's conclusion is supported by the record, the Court defers to the IHO's determination and finds that Plaintiffs' placement of T.C. at Prospect was appropriate.

Specifically, the IHO noted that Prospect has special education teachers who "are trained to be diagnostic and prescriptive, which allows them to be flexible in the way they develop the curriculum to meet [T.C.'s] needs."  (IHO Op. 21.)[29]  Accordingly, Prospect teachers "are able to

---

[29] The IHO relied, in large part, on the testimony of Dr. Raymond.  At oral argument, the District argued that under *Hardison v. Board of Education of Oneonta City School District*, 773 F.3d 372 (2d Cir. 2014), Plaintiffs' failure to call any of T.C.'s teachers at Prospect precludes a finding that they carried their burden of demonstrating that Prospect was an appropriate placement for T.C.  The child in *Hardison* suffered from a number of mental health issues that negatively affected her performance in public school.  *Id.* at 377–78.  Her parents unilaterally placed her at "Family Foundation," a school "not designed for traditionally learning disabled students," but rather, a school "designed for students in need of therapeutic intervention."  *Id.* at 379–80.  The Second Circuit ultimately found it appropriate to defer to the SRO's determination that the parents had failed to meet their burden to establish the appropriateness of their placement of the child at Family Foundation.  *Id.* at 386.  This decision rested in large part on the fact that the parents relied chiefly on testimony from Jeffrey Brain, Family Foundation's Vice President for External Relations and Director of Admissions, who testified that the child was progressing well psychologically, but "did not know any details of how [the child] was progressing academically or how her psychological progress tied into her educational progress."  *Id.* at 383,

look at how a student is performing on a moment by moment basis and be flexible in the way that they deliver their curriculum and create their curriculum." (Tr. 1078.)[30]  As the IHO stated, this provides the "'eclectic' approach recommended by Dr. Stern." (IHO Op. 21; *see also* Stern 2010 Report 16 (noting that T.C. suffers from a "complex constellation of issues" that would "require a flexible approach to teaching and a program that incorporates a variety of teaching methods"); Tr. 676 (testifying that an educational program uniquely designed to support T.C. would "select[] educational approaches in an eclectic manner").)

The IHO also found that Prospect was able to provide T.C. with the individualized and smaller group instruction that he needed based on his unique needs. (IHO Op. 21–22.) Dr.

---

387. On the other hand, others at Family Foundation who would have been aware of that information—such as the child's teachers—were not called as witnesses by the parents. *See id.* at 387.

The circumstances in *Hardison* are different from those in this case.  First, while the parents' chief witness in *Hardison* testified "that he neither directly observed [the child] in class, nor spoke with her teachers about her academic progress," *id.* at 383–84, Dr. Raymond was quite involved in T.C.'s educational experience at Prospect.  Dr. Raymond testified that she generally "meet[s] weekly to discuss student progress and monitor any student data." (Tr. 1053.)  With respect to T.C. specifically, when he enrolled at Prospect, Dr. Raymond "worked very closely" with his teacher "to develop a program for [T.C.]" based on the information they had about him. (Tr. 1066–67.)  She also testified that she "met once a month to talk about [T.C.'s] progress and to . . . coordinate the curriculum." (*Id.* at 1067.)  Second, the record also contains T.C.'s Prospect progress reports (*see, e.g.*, Ex. I), which contain detailed statements regarding T.C.'s academic progress written by his teachers.  Third, because T.C. did not attend Prospect for "therapeutic intervention," the Second Circuit's concern about the lack of a connection between testimony related to psychological progress and academic progress is not present here.  Finally, given the need to defer to the decisions of state authorities, it bears noting that the SRO in *Hardison* had concluded that the parents *did not* satisfy their burden related to the private placement, while here the IHO (the only state authority to consider the question), determined that the parents *did* satisfy their burden related to the private placement.

[30] Indeed, Dr. Raymond testified that she meets with teachers weekly "to discuss student progress and monitor any student data." (Tr. 1053.)

Raymond's testimony indicated that T.C. was instructed in core academic subjects individually or in small groups of two in both 2012-2013 and 2013-2014.  She testified that for the 2013-2014 school year, T.C. was "grouped with one other student" for literacy and for math, (Tr. 1122), and that the size of T.C.'s instruction groups the previous year was not any larger, (*id.* at 1088).  Dr. Raymond also noted that Prospect's math specialist "does push into [T.C.'s] class at times to work with T.[C.] individually, especially at the beginning of the school year she pushed in on a regular weekly basis" and gave him "more intense service."  (*Id.* at 1124.)  Additionally, Dr. Stern's 2013 report described her observations of T.C. in one-on-one instructional settings in reading and math, (Stern 2013 Observation 1–2), and noted her view that "the very small student to teacher ratio of [t]he Prospect School allows [T.C.'s] teachers to modulate the pace at which information is provided and the rate at which [T.C.] is required to respond," (*id.* at 3).  Also, discussing the 2012-2013 school year, S.C. explained that Prospect used secondary practitioners in literacy and math, and that T.C. received instruction in those subjects in group sizes ranging from one to four students.  (Tr. 930–31.)

The IHO noted Dr. Stern's 2013 observation of T.C. at Prospect and her testimony concerning the same (including her conversations with T.C.'s teachers), in which she relayed that T.C.'s "educational setting [at Prospect] is one that provides significant opportunity for one-to-one instruction and is viewed as an appropriate setting to support his unique constellation of learning needs."  (*See* Stern 2013 Observation 3; *see also* Tr. 681–82; IHO Op. 22.)  Dr. Stern further reported that T.C.'s educational setting at Prospect addresses his attention deficiencies because the "highly individualized instruction[] allows for flexibility in lessons, as well as the

46

opportunity to shift from one activity to another in accordance with [T.C.'s] focus and receptivity." (Stern 2013 Observation 3.) Because T.C. would be "lost in a larger classroom," Dr. Stern concluded that Prospect presented "an educational setting that is well suited to meet [T.C.'s] complex learning needs," and, therefore, that "continued enrollment at [t]he Prospect School is very strongly supported." (*Id.* at 3–4.)

Prospect's program for T.C. addressed other needs of T.C. as well. Dr. Raymond explained that Prospect modifies instruction for T.C., such as by restating directions, using manipulatives, changing the font size, and putting less information on paper. (Tr. 1147.)[31]

The IHO further concluded that T.C. made progress at Prospect. (*See* IHO Op. 22.) Based on testimony and reports, the consensus among those at Prospect was that T.C.'s progress, while inconsistent, was ultimately on a steady, positive trajectory. For example, Dr. Raymond testified that T.C. made "steady progress in reading" and was "able to decode a variety of unfamiliar words and self-correct." (Tr. 1083.) She further explained that T.C.'s "progress can

---

[31] While it is true that Prospect did not continue T.C.'s social skills class during the 2013-2014 school year, (Tr. 1125–27), the IHO found that this did not render the educational program inappropriate because Dr. Raymond testified that "by that time, T.C. was well immersed with the student population and that the students at both the Wooster School and the Prospect School 'adored him,'" (IHO Op. 22). Dr. Raymond's testimony was corroborated by S.C., who explained that T.C. made a number of friends at Prospect, went on "[a] lot of play dates," and he remains "on the party circuit," going to a substantial number of his peers' parties. (Tr. 845–47.) Dr. Stern echoed this view, noting that her observations led her to conclude that T.C. is a "well-liked and well-respected student" at Prospect. (Stern 2013 Observation 3.) Moreover, T.C.'s social interaction at Prospect is not limited to other students in his special education class. Indeed, one of his two best friends is a typically developing general education student. (Tr. 847.) On the other hand, S.C. testified that while T.C. went to school at the District, he had "basically two friends," both of whom were in his special education class. (*Id.* at 846–47.) As another point of comparison, S.C. testified that while at the District, T.C. was invited to one birthday party, but while he was at Prospect, he was invited to six birthday parties in his first year at the

be inconsistent" and his performance at the school was a "kind of slow and steady, a step back, two steps forward" learning that required lots of repetition.  (*Id.* at 1084.)  This is corroborated by Dr. Stern, whose 2013 observation report describes her conversations with T.C.'s teachers at Prospect.  Specifically, T.C.'s "teachers were unanimous in using the word 'inconsistent' to describe [T.C.], noting that concepts that he seems to have mastered one day may not be displayed on a subsequent day."  (Stern 2013 Observation 3.)  However, his teachers went on to describe T.C. "as making steady, but slow progress in all areas and as demonstrating a consistently positive movement through teaching modules and levels."  (*Id.*)  Each teacher invoked, in some manner, the expression "three steps forward and one step[] back," to indicate that "while cumulative learning is unquestionably taking place, gains do take time to become solidified."  (*Id.*)

T.C.'s progress report for the 2012-2013 school year conveys that T.C. was either "developing" or "meeting target expectations" with respect to most of his educational goals and objectives for the year.  (*See* Ex. I at 3–8.)  The progress report contains teacher comments indicating that T.C. "made tremendous progress" in reading (including his ability to decode new words and use context clues to decode unfamiliar words) and showed "notable progress in the area of math" (including reduced reliance on "counters" for addition problems and more consistency in his ability to carry out subtraction computations).  (*Id.* at 11–12.)  This progress is corroborated by S.C.  He testified that, once at Prospect, T.C. read to him on a nightly basis, allowing S.C. "to not only track his progress but [also to see] if there was any regression."  (Tr.

---

school.  (Tr. 847.)

933–34.)  He further explained that T.C. was "doing well" and progressing in a "[t]hree steps forward and one step back" kind of way, but that "the key was . . . as the sentences and the words were getting a little more complex, he was able to hang with it."  (*Id.* at 934.)[32]  While S.C. "does not have the academic credentials" of some of the experts that testified, "[]he is an expert when it comes to the development and learning style of h[is] own [son], and nothing to which []he testified was inconsistent with the experts' testimony."  *G.B. ex rel. N.B. v. Tuxedo Union Free Sch. Dist.*, 751 F. Supp. 2d 552, 579 (S.D.N.Y. 2010), *aff'd*, 486 F. App'x 954 (2d Cir. 2012).

The District argues that T.C.'s low standardized test scores while at Prospect demonstrate that Prospect was not an appropriate placement for T.C.  (*See* Def.'s Mem. 18–20.)  However, the IHO considered T.C.'s standardized test scores but, relying on the testimony of Dr. Raymond and Dr. Stern, determined that such tests did not provide an accurate depiction of T.C.'s academic progress.  (IHO Op. 22–23.)  Specifically, Dr. Raymond testified that T.C. has "such a complicated profile of strengths and weaknesses that standardized testing with him is very challenging," because evaluators cannot make the modifications necessary to account for T.C.'s unique way of learning and demonstrating skills.  (Tr. 1077–78.)  According to Dr. Stern, "quantitative standardized measures . . . are not the best measure of progress in a student with complex disabilities like T.[C.]," given that they consider just a "snapshot of a student."  (*Id.* at 683.)  Given the support for the IHO's conclusion, and the fact that the District itself states that "the mere recitation of scores is not an accurate representation of [T.C.'s] progress," (Def.'s 56.1

---

[32] According to S.C., this stood in contrast to T.C.'s time at the District, where T.C. had only occasional "flares" where he grasped a concept but that such a grasp was fleeting and eventually gone.  (Tr. 824–25.)  In contrast to T.C.'s time at Prospect, S.C. "never saw anything

¶ 25), the Court defers to the IHO on this issue.  *Cf. E.S. ex rel. B.S. v. Katonah-Lewisboro Sch. Dist.*, 742 F. Supp. 2d 417, 444 (S.D.N.Y. 2010) ("While [the student's] scores indicate extremely low intellect and academic ability, the teachers [at the private placement] are seeing progress in core academic areas and . . . [r]eports from his math teacher show that . . . overall [the student] is doing much better in classroom settings than his scores would imply."), *aff'd*, 487 F. App'x 619 (2d Cir. 2012).

Finally, the District argues that Plaintiffs' placement of T.C. at Prospect was inappropriate because of the composition of T.C.'s peer group.  (Def.'s Mem. 20–21; Def.'s Reply Mem. 8–9.)  Based on its reply memo, the District appears to argue that T.C.'s peer grouping rendered the Prospect program too restrictive.  (*See* Def.'s Reply Mem. 8 ("The District submits that the restrictiveness of a placement is directly related to peer groupings . . . .").)  However, the District relies on a Second Circuit case that expressly states that "while the restrictiveness of a private placement is a factor, by no means is it dispositive."  *C.L.*, 744 F.3d at 837.  Dr. Raymond testified that T.C. attended social studies, gym, art, lunch, recess, music, and library with general education students at the Wooster School.  (*See* Tr. 1067–70, 1082–83.)  The Court notes that this is similar to the mainstreaming options provided in the June 2012 and May 2013 IEPs.  (*See* May 2013 IEP 18 ("Student will be participating with typical peers in grade level activities as well as recess, lunch, art, music, [and] physical education."); June 2012 IEP 20 (same).)  Although Plaintiffs are not held to the same mainstreaming requirements as school districts, *Weaver v. Millbrook Cent. Sch. Dist.*, 812 F. Supp. 2d 514, 524 n.9 (S.D.N.Y. 2011), it

---

consistent" while T.C. was at the District.  (*Id.* at 825.)

bears noting that one consideration for determining whether a program is the least restrictive environment is "whether the school has included the child in school programs with nondisabled children to the maximum extent appropriate," *id.* (internal quotation marks omitted). Given T.C.'s academic abilities and need for intensive support in his core academic classes, integrating T.C. with general education students beyond those activities listed above likely would have been inappropriate.

### 3. Whether the Equities Support Reimbursement

Although the Court has found that the District failed to provide a free appropriate public education to T.C. for the 2012-2013 and 2013-2014 school years, and that Plaintiffs' unilateral placement in Prospect for those two years was appropriate, the Court still must consider whether the equities favor reimbursement. *See R.E.*, 694 F.3d at 184–85 (noting that the parents bear the burden of establishing "that the equities favor them").

The SRO did not reach this issue while the IHO concluded that "the equities warrant full tuition reimbursement for [T.C.'s] placement at [Prospect] for the 2012-2013 and 2013-2014 school years." (IHO Op. 24.) The IHO based this conclusion on evidence that demonstrated that Plaintiffs provided the District with the requisite notice of T.C.'s removal from the District in August 2011, at least one parent attended all of the CSE meetings, Plaintiffs provided the CSE with private evaluations obtained at their own expense, and Plaintiffs continued to communicate with the District, even after T.C. was unilaterally placed at Prospect. (IHO Op. 23–24.) While "the deference owed to . . . administrative decisions may be less weighty when it comes to reviewing whether the equities support a reimbursement award," *E.W.K. ex rel. B.K. v. Bd. of*

*Educ.*, 884 F. Supp. 2d 39, 48 (S.D.N.Y. 2012) (internal quotation marks omitted), the Court nonetheless agrees with the IHO's determination.

The record supports the conclusion that Plaintiffs were actively involved in the formation of the June 2012 and May 2013 IEPs, cooperated with District officials, and communicated their objections to each IEP. *See Bettinger v. N.Y.C. Bd. of Educ.*, No. 06-CV-6889, 2007 WL 4208560, at *6 (S.D.N.Y. Nov. 20, 2007) ("Certainly[,] a major consideration in deciding whether the [equities] factor is satisfied is whether the parents have cooperated with the [school district] throughout the process to ensure their child receive a FAPE."). In the months leading up to the June 2012 CSE meeting, Plaintiffs communicated with the District numerous times regarding the forthcoming CSE meeting to develop the IEP and regarding T.C.'s availability to be re-evaluated to provide additional data for the CSE to develop an IEP. (*See* Def.'s 56.1 ¶ 40.) And Plaintiffs made T.C. available to the District to conduct those additional evaluations and also allowed Ms. Hayes to observe him at Prospect. (*See* Exs. 8–11.) Plaintiffs stated at the June 2012 CSE meeting that they disagreed with the 2012-2013 recommendation. (June 2012 IEP 3.) Before the May 2013 CSE meeting, Plaintiffs provided the District Dr. Stern's report summarizing an observation of T.C. at Prospect, (*see* Ex. AAAA; *see also* Stern 2013 Observation), and allowed Ms. Hayes to once more observe T.C. at Prospect, (*see* Ex. 13). And at the May 2013 CSE meeting, Plaintiffs stated that they disagreed with the 2013-2014 recommendation. (May 2013 IEP 2.) Even after the May 2013 CSE meeting, J.C. visited the District to observe the classroom that T.C. would be in if he returned to the District. (Tr. 239–40.)

The District argues that the equities do not tilt in Plaintiffs' favor for three reasons:  (1) in March 2012, before the June 2012 IEP was finalized, J.C. "stated that she was adamant that she was not considering a placement in the District for T.C.," (2) Plaintiffs enrolled T.C. at Prospect in March 2013, before the May 2013 IEP was finalized, and (3) Plaintiffs failed to share a "prognosis" given by Dr. Dorta addressing T.C.'s future progress and a chart showing two divergent lines, one representing T.C.'s progress and the other a typically developing student's progress.  (Def.'s Mem. 21–22.)  The Court finds the District's arguments unpersuasive.

First, while "[a] court is justified in denying tuition reimbursement where there is no indication the parents ever intended to return their child to a placement offered by the school district," *J.S. v. Scarsdale Union Free Sch. Dist.*, 826 F. Supp. 2d 635, 675 (S.D.N.Y. 2011), the Court sees no reason not to defer to the IHO's conclusion that the record "clearly show[ed]" that it was the district's repeated recommendation of a 12 student classroom that J.C. adamantly refused to consider, not *any* placement in the District.  (*See* IHO Op. 24.)  Specifically, the evidence cited above demonstrating numerous communications between Plaintiffs and the District, as well as T.C. being made available for evaluations and Plaintiffs', and their representatives', participation at the relevant CSE meetings, support the IHO's conclusion. Further support comes from S.C.'s testimony indicating that in her conversation with Ms. Hayes, J.C. was speaking about her refusal to place T.C. back in "that specific special education program with those students and that combination of learners" and not "the district" more generally.  (Tr. 1011.)

53

Determining whether the signing of the enrollment contract for the 2013-2014 school year before the May 2013 IEP was generated, (*see* Ex. BBBB), should limit Plaintiffs' right to recovery, depends upon whether signing the contract demonstrates that Plaintiffs had never intended to seek a District placement.  Accordingly, courts addressing this issue have noted whether the enrollment contract committed the student to attend the private school, *see, e.g.*, *Wood v. Kingston City Sch. Dist.*, No. 08-CV-1371, 2010 WL 3907829, at *9 (N.D.N.Y. Sept. 29, 2010) (finding the equities supported reimbursement despite the plaintiffs' signing of contracts with the private school where the director of the private school "understood that we were not clear if we were going to keep him there or not" (internal quotation marks omitted)), whether any deposit was refundable, *see V.S.*, 2011 WL 3273922, at *15 (finding that balance of equities did not counsel against awarding reimbursement despite "partially refundable deposit" being paid to private school), and the parents' need to secure a spot in a private school should the school district fail to provide an acceptable program, *see T.K.*, 810 F.3d at 878–79 (rejecting argument that the plaintiffs were not entitled to reimbursement because of a one-month's tuition deposit paid to the private school, given that the private school required a deposit before the meeting at which the IEP was developed and "waiting would have imperiled the[] [parents'] ability to secure a spot" for their child).  Here, the record does not clearly elucidate the financial commitment made by Plaintiffs when they signed the enrollment contract in March 2013.  (*See* Ex. BBBB.)  The contract refers to an advance deposit of $8,400 and a $924 payment for "Tuition Refund Insurance."  (*Id.* at 2.)  The Court points out that the contract for the 2012-2013 school year contained language stating that the enrollment contract obligated Plaintiffs to pay the

entire tuition, unless enrollment was canceled by July 1, 2012.  (Ex. M. at 1.)  In that case,

Plaintiffs would have remained liable only for the "Reservation Fee," which is not defined.  (*Id.*)

Elsewhere, the 2012-2013 agreement states that a 20% non-refundable deposit was due with the

signed contract.  (*Id.*)  While not conclusive, it would appear, therefore, that the 2013-2014

enrollment contract signed in March 2013 put Plaintiffs on the hook for the $8,400 advance

deposit, regardless of whether T.C. attended Prospect the upcoming year.  While this is not an

insignificant amount of money, the Court is not convinced that such a deposit, when considered

in conjunction with the Parents' involvement in the CSE meeting and J.C.'s visit to the District

to observe T.C.'s possible placement, demonstrates that Plaintiffs had no intention to consider a

District placement if the placement addressed their articulated needs.

      Finally, the Court does not agree that Plaintiffs' failure to provide Dr. Dorta's "divergent

line" chart "demonstrate[s] a predetermination on [Plaintiffs'] part to reject the public placement

and privately place T.C."  (Def.'s Reply Mem. at 10.)  It is unclear why Plaintiffs would

*themselves* alert the District to the fact that they initiated an evaluation of T.C. and distribute the

entire written report created by Dr. Dorta at a meeting called to discuss the report if they had

already determined that T.C. would be placed in a private school.  Additionally, it bears noting

that the meeting to discuss Dr. Dorta's report was held on January 26, 2010.  (*See* Ex. CCC at 5.)

But T.C. remained in the District for the 2010-2011 school year.  It strains credulity to find that

on January 26, 2010, when Plaintiffs allegedly chose not to provide the "divergent line" charts

along with Dr. Dorta's report, Plaintiffs had already predetermined that over a year and a half

later T.C. would attend Prospect.

Based on the foregoing, the Court finds that the equities support an award of tuition reimbursement for Plaintiffs.

## III. Conclusion

For the foregoing reasons, Plaintiffs' Motion for Summary Judgment is granted and the District's Motion for Summary Judgment is denied. The Clerk of Court is respectfully requested to terminate the pending Motions. (Dkt. Nos. 10, 15.)

Plaintiffs are to provide the Court, by letter, with a proposed judgment reflecting the amount of reimbursement to which they are entitled in light of the Court's decision, along with an affidavit substantiating the reimbursement amounts, within 14 days of this Opinion & Order. The District may respond within 14 days if it wishes to challenge the Plaintiffs' calculations.

Plaintiffs are also to provide the Court with a submission detailing why they are entitled to attorneys' fees and an affidavit substantiating the amount of fees sought within 30 days of this Opinion & Order. The District may respond within 30 days if it wishes to challenge Plaintiffs' submission.

SO ORDERED.

DATED:     March **30**, 2016
           White Plains, New York

KENNETH M. KARAS
UNITED STATES DISTRICT JUDGE

56